ELIZA N. SHEAR, APPELLANT, VS. WILLIAM L. ROBINSON, APPELLEE.

1. When a married woman has appeared before a magistrate, having signed a deed and acknowledged it, and he certifies a full compliance with the statute, his certificate, except fraud be shown, must be held conclusive of the facts it asserts. (Agreeing with Hart vs. L'Engle *et al.*, January Term, 1881.)

2. A conveyance of land and other property in form, an absolute deed of bargain and sale in consideration of an indebtedness secured by a prior mortgage, (held by the grantee, who is in possession under a lease,) and of subsequent advances, said deed being executed under circumstances inducing the grantor to believe that it is intended as a security for the money named as the consideration, and the prior mortgage being foreclosed by the grantee for the entire amount named as the consideration of the deed, the mortgagor, a married woman, consenting thereto, and the prayer of the bill asking for a decree of sale, and that the proceeds of the sale be applied to pay the complainant the amount of money named as the consideration of the deed and interest thereon, and the surplus, if any, to be paid to the grantors—such deed will be deemed a mortgage.

3. A decree procured by the complainant under such foreclosure proceedings, which provides that the surplus on a sale of the premises, after paying the amount named in the deed of conveyance, is to be paid to the grantor or mortgagor, is not only substantial evidence of the character of the deed as a security only, but is a judicial demonstration thereof.

4. Where a mortgagee bid in property for a much larger sum than the amount due by the decree of sale, under the advice of counsel that he would not be required to pay over any surplus to the mortgagor, and being advised that he is entitled to retain such surplus because he is already the owner of the property so sold, he is not entitled to be relieved from his bid on the alleged ground that he acted under a mistake of fact, the mistake alleged being purely one of law and not of fact.

5. A purchaser is not entitled to be relieved of his bid under such circumstances upon the additional ground that the property is worth much less than he had bid, especially when another responsible bidder offered $7,900 and the purchaser bid $8,000.

6. A paper purporting to be a release of the complainant from the ef-

fects of his first bid at a mortgage sale, signed by the mortgagors, (a married woman and her invalid husband,) and releasing the purchaser from paying over the surplus, to which the mortgagors are entitled by the decree of sale, the assent to such paper having been obtained by the complainant by imposing upon their weakness and confidence in the absence of counsel or advice, is of no effect to curtail or control their legal or equitable rights so sought to be affected.

Appeal from the Circuit Court for Leon county.

The case was decided by Hon. John A. Henderson as Referee, to whom it was referred by consent of parties. L. N. Shear died after the appeal was taken, and the case proceeded in Mrs. Shear's name, he having been a defendant in her right.

On the first day of August, 1877, Eliza E. Shear and L. N. Shear, her husband, executed a mortgage to Robinson upon her separate property to secure a promissory note of $1,590 of that date, due one day after date, and further advances to be made by Robinson in money, provisions and supplies; the amount of the mortgage security being limited to $2,000. The property included in the mortgage consisted of a plantation of some 957 acres of land, with the improvements thereon, and a large quantity of personal property, including household furniture, ornaments, pictures, books, carriages, harnesses, &c.

On the same day of the date of the mortgage, Mrs. Shear and her husband executed and delivered to Robinson a lease of the said plantation and personal property for the term of five years, and until the first of January following, at the annual rent of three thousand pounds of lint cotton, from which rent Robinson might deduct the taxes upon the property if he should pay them. Robinson was put into the immediate possession of the property by the terms of the lease.

On the seventh day of January, 1878, Robinson filed his bill of foreclosure against said mortgagors, alleging " that

on the first day of August, 1877, the defendants then being greatly indebted to various parties by judgments and otherwise, and being greatly distressed for money, applied to your orator for assistance, who agreed to furnish certain sums of money and to make certain advances in aid of said defendants, who agreed to execute to your orator a mortgage upon certain real and personal estate in Leon county for said money and advances; that your orator, in pursuance of said agreement, proceeded to make such advances and to assume such indebtedness of defendants, and on the day aforesaid, the defendants being then indebted to your orator in the sum of $1,590, and your orator having agreed to assume certain other indebtedness of defendants, and to make further advances, which have since been made, amounting to the further sum of $1,746.91, the defendants on that day executed in due form of law a mortgage to your orator to secure the first-named sum of money, which was due by a promissory note of defendants for that amount; * * * that the defendants have never repaid any part of the said indebtedness, and that the whole amount is now justly due;. * * * that said defendants are unable to cultivate said lands conveyed in said mortgage, and unable to make it available as a source of income, or to pay the taxes thereon, or to keep the same in repair, so that the security for your orator's debt is becoming daily of less value; so that a sale of the said property is necessary for the raising of the money now due by said defendants to your orator, and which they have wholly neglected to pay, and, as your orator alleges, are wholly unable to pay. Wherefore, in tender consideration of the premises, your orator prays that your honor will grant unto your orator a suitable decree of foreclosure of said mortgage, forever barring and foreclosing the said defendants and all persons claiming by, through or under them of all right, title, in-

terest or equity of redemption in and to said mortgaged premises and property ; * * * that youe honor will render a decree in favor of your orator, against said defendants, for said amount, and that your orator may have execution thereon as in other cases, and that said property be sold by said master under the directions of this court, and that the proceeds of said sale be applied, first, to the payment of the costs of this proceeding, and then to the payment of the principal and interest of your orator's claim, and the balance, if any, be paid by said master over to defendant, Eliza E. Shear, to her sole and separate use."

These provisions and prayers of the bill are given in its own words. The bill was duly sworn to by complainant January 3, 1878. The defendants, by an indorsement upon the bill, waived service of process January 4, 1878, and on the same day signed an answer confessing all the allegations of the bill, and admit " that the said William L. Robinson has assumed for and advanced to them under said mortgage the sum of thirty-three hundred and thirty-six and ninety-one hundredth-dollars, including note ; and that they have never repaid any part of said indebtedness to said William L. Robinson ; and that the said amount of $3,336.91-100 is now due and owing to him ;" and they therefore consent to a decree of foreclosure as prayed for in said bill of complaint. This answer was filed together with the bill on the seventh day of January, 1878. On the 31st January, 1878, a decree of foreclosure was rendered upon said bill and answer, and it was " ordered, adjudged and decreed that the said complainant do have and recover from the defendants the sum of three thousand three hundred and thirty-six dollars and ninety-one cents for amounts advanced and assumed by said complainant for and on account of said defendants ; and the mortgaged property, real and personal, was ordered to be sold, and that the " proceeds of the sale

be applied, first, to the payment of the costs and expenses of these proceedings, and the remainder toward the payment and satisfaction of the said sum of three thousand three hundred and thirty-six dollars and ninety-one cents and interest from the date of this decree; and if there shall not be enough for that purpose that an execution do issue against said Eliza E. Shear and LeRoy N. Shear for any balance that may remain after applying said proceeds, to be levied as other executions at law. And it is further ordered that should there be a surplus over and above the said sum of $3,336.91-100, together with interest and costs of court, after such sale as aforesaid, then it shall be the duty of the said master to turn over said surplus to the defendants, Eliza E. Shear and LeRoy N. Shear."

In pursuance of this decree the master sold the property in June, 1878, for the sum of $8,000, to the complainant as the highest bidder, and the master reports that " Robinson, the purchaser of said property, declines to receive a deed or to pay to the master the amount of said bid after deducting the amount of the decree," but makes a statement, which is submitted to the court by the master. The substance of this " statement " was afterwards bodied in a petition to the court praying that the master be directed to make a deed to him without requiring the payment of any money except the costs; or that the sale be declared void and set aside and petitioner released from his bid. This petition, being entitled of this cause, is as follows:

*To the Hon. P. W. White, Judge:*

Your petitioner, William L. Robinson, respectfully represents unto your honor that he is the complainant in the above entitled cause; that on the first Monday in June, A. D. 1878, W. K. Beard, master in said cause, by virtue of a decree therein offered, for sale certain real estate and personal property in said decree mentioned, and the same was

knocked off to your petitioner for the sum of eight thousand dollars; that the circumstances and impressions under which your petitioner bid on said property were as hereinafter set forth; that in August, 1877, the defendants executed to your petitioner a lease of the real estate described in said decree for the period of five years from January 1st, 1878, and on or about the same day in August the said defendants executed to your petitioner a mortgage of all their interest in said real estate and personal property described in said decree to secure indebtedness of the said Eliza E. Shear to your petitioner; that a suit was instituted in the above named court on or about the 4th day of January, A. D. 1878, to foreclose said mortgage, and on the same day the said defendants answered, confessing the facts stated in the bill of complaint; and on the same day your petitioner became the purchaser of all the right, title and interest of said defendants in the said real estate and personal property, and the same was conveyed to him in fee simple absolute; that your petition then paid to said defendants $500 in cash, which, with the said mortgage and other indebtedness, was the agreed price for said real estate and personal property; that your petition was advised by counsel that, although he had become the owner of the entire estate by said purchase, for which he paid the full value, it would place his title in a clearer and better apparent condition to continue the foreclosure suit and have a decree and sale. Relying upon such advice your petitioner caused said suit to be prosecuted to a final decree, and on the 31st day of January, 1878, such decree was entered, although he had previously become the entire owner of the property as aforesaid; and relying still further upon the advice of counsel, he caused the property to be advertised for sale, and just before the sale was advised by counsel that it would not at all complicate your petitioner to bid on said property at

said sale to any amount over and above the decree, and that he would not have to pay any money on such bid; that your petitioner, relying upon such advice, and the property having been run up by a bidder who, as he now believes and then believed, was bidding for the purpose merely of annoying him, your petitioner did bid as high as $8,000 for the same, and it was knocked off to him; that after said sale your petitioner learned, with great surprise, that there is a provision in the decree that the balance of the money, over and above the amount of the decree and costs, should be paid to the defendant, when, in fact, he has, since January 4, 1878, been the owner of the entire property; that no bid over the amount of the decree and costs would have been made by your petitioner had he not been misinformed and misled as to what the terms of the decree were, and the possible state of complication which might result to him; nor would he have offered such property for sale under such decree if he had not thought and believed that he could, with impunity, have bid any amount without having to pay any money as aforesaid other than the costs, and that said property belonged to him; that under these circumstances your petitioner directed a communication to W. K. Beard, the master, setting forth the facts substantially as herein stated, and refused to take a conveyance or to pay any money except the costs; that after said sale, and as soon as the defendants were apprised of the facts as above set forth, they executed to your petitioner an instrument under their hands and seals setting forth the facts of the case, the mortgage and the sale to your petitioner of said property, and that the foreclosure of said mortgage was made on the advice of counsel, although they had fully and for full and valid consideration received sold to your petitioner all their interest in said property, and that said decree directing the payment of the balance of the purchase-

money, if any, was contrary to the rights of said parties, and by said instrument they relinquished all claim to said balance, after reciting the facts of the foreclosure and sale and the bid of your petitioner, and they thereby consent that the said sale be set aside, or that the master execute to your petitioner a deed to said property without requiring the payment of any money except the costs of such foreclosure, suit and sale ; that soon after the execution of the deed to your petitioner he signed a paper stating that he would sell to Mrs. Shear the plantation and household furniture as it then stood, which she and her husband had previously conveyed to him, for the sum of thirty-three hundred and thirty-six dollars, and full value for any improvements and all expenses of said plantation incurred in improvements or connected therewith, with interest at the rate of eighteen per cent. upon the sums of money so expended up to the date of such sale, if made to her ; that afterwards the original of this agreement was destroyed by agreement of the parties, and the same was renewed. Your petitioner therefore prays your honor that the master, W. K. Beard, may be directed to make a deed to all of said property so sold by your petitioner without requiring the payment of any money except the costs of the suit and of said sale, or that said sale may be ordered by your honor to be set aside and declared void, and your petitioner released from his said bid.    And may it please your honor to grant unto your petitioner such other and further relief as may seem meet, just and equitable in the premises.

And your petitioner will ever pray, &c.

GEO. P. RANEY,<br>J. T. BERNARD,<br>Attorneys for Petitioner.

Mr. Raney had not been connected with the case until after the foreclosure sale, from which relief is sought.

The defendants filed an answer to said petition on oath as follows:

Sworn to by Mrs. Eliza E. Shear.

Now come the defendants by their attorneys, David S. Walker, Jr., and E. M. Hopkins, and in answer to the allegations set forth in the petition of William L. Robinson, filed in this cause, say : That true it is, as alleged in said petition, that said plaintiff bid eight thousand dollars for the property of these defendants, which was sold by the said master on the first Monday in June, 1878, under a decree of foreclosure in favor of the said plaintiff, against these defendants, for $3,336.91-100, and that the said property was knocked down and sold to the said plaintiff at the said sum of eight thousand dollars.

2. And that it is also true, as alleged by said plaintiff, that these defendants on the first day of August, 1877, executed a lease of their plantation to the said plaintiff for five years, and also a mortgage on said plantation and personal property on the same day, said mortgage being a security for the payment of fifteen hundred and ninety dollars and advances to be made by the plaintiff to these defendants, not to exceed two thousand dollars, but that these two instruments of writing were but one contract, and were so considered at the time they were executed by all parties thereto, both being signed at one and the same time, and it being considered that a violation of any of the provisions of one of them would be a violation of the other ; that is to say, that they related to each other, and were, both taken together, an entire contract.

3. That it is also true that on or about the 10th of January, 1878, these defendants did sign an answer to the bill filed against them by the plaintiff, confessing the allegations set forth in the said bill, but that it is wholly untrue that the said plaintiff did, on the 4th day of January, 1878,

or at any other time, become the purchaser of all the right, title and interest of these defendants in the said real and personal property, or that these defendants ever conveyed to him, in fee simple, absolute, their or either of their interest in said real and personal property. It is true that these defendants did, on or about the 10th day of January, 1878, execute an instrument of writing to the said plaintiff for the purpose of securing 'the amount of money then claimed by the said plaintiff to be due under the said mortgage, to-wit: the said $1,590, and $1,246.90 advances already made under the said mortgage, and also five hundred dollars additional thereto then and there advanced to these defendants ; and that said plaintiff never until now has claimed that, by virtue of said instrument of writing, he was the purchaser of the fee simple, absolute, of said property.

4. That under the said mortgage the plaintiff agreed, in consideration of the premises therein mentioned, to advance to the defendants two thousand dollars in money, provisions, supplies, &c., but that after advancing to them only $1,246.91-100 he refused to make any more advances without further security, and on the 4th day of January, 1878, commenced proceedings to foreclose the said mortgage ; that the said $3,336·91-100, the amount of the decree rendered in pursuance of the prayer of said bill, was taken together, the amount of the said note for $1,590 and $1,746.-91-100, claimed by the plainniff to have been advanced to these defendants, including the said sum of five hundred dollars paid to them at the time of executing the pretended deed, on or about the 10th day of January, 1878 ; and that it is this same amount of $3,336.91.100, and identically the same money that is stated as the consideration of the pretended deed ; that is, the said pretended deed was made for the purpose of securing the said sum of $1,590 and $1,-

746.91-100 of advances, which had been made from the date of the mortgage up to the date of the pretended deed. The only difference between the consideration of the mortgage and the consideration of the pretended deed being that the mortgage was given to secure the $1,590 and $2,-000 *to be advanced*, and the pretended deed being to secure the said $1,590 and $1,746.91-100, the latter amount being that portion of the said two thousand dollars then claimed to have been actually advanced; that at the time these defendants executed the pretended deed the plaintiff had their confession of the allegations set forth in the bill which claimed from these defendants $3,336.91-100, which was five hundred dollars more than these defendants then owed the said plaintiff, and that the said plaintiff paid to them this amount to make out the said sum of $3,336.91-100; that these defendants received no consideration whatever for executing the said pretended deed since it was already their right under the mortgage to have the said five hundred dollars advanced to them, and the plaintiff already had their confession of judgment for the same, and, in justice under the mortgage, they had a right to receive from the plaintiff, by way of advances, $253.09-100 in addition to the $1,746.91-100 he had already advanced, since it would require that much to make the full amount of two thousand dollars, the amount promised by the plaintiff to be advanced under the mortgage; that it is probably true that plaintiff's counsel advised him that it would place his title in a clearer and better apparent condition to foreclose the mortgage and purchase the property, for certainly such advice was correct and good law, as plaintiff had no title and could not obtain one otherwise. But if true, as alleged, that plaintiff's counsel advised him that he would not have to pay these defendants the amount he should bid off for after deducting the amount due by these defendants to him, such

advice was given upon the false representations of said plaintiff to his counsel; that he was already the owner of the fee simple title to the said property ; and that even if such advice was given by counsel with a full knowledge of the facts, it would not relieve the plaintiff from the obligation of paying the purchase-money.

6. That plaintiff's allegation that the said R. S. Williams, who bid $7,900 at said sale, bid said amount for the purpose of annoying said plaintiff and causing him expense, is entirely untrue, the fact being that the said Williams bid said amount with the intention of buying, and was ready, able and willing to pay said amount had the property been knocked down and sold to him ; that it is untrue that the said property is not worth more than $3,336.91-100, and that the true value of the real estate with improvements is about $13,000, these defendants having paid therefor, in 1870, on the 23d day of April, ($11,920) eleven thousand nine hundred and twenty dollars, and on the 17th day of February, 1871, one thousand dollars more, making in all ($12,920) twelve thousand nine hundred and twenty dollars, as shown by the deeds of Eliza Williams and Joseph John Williams, her husband, to Eliza E. Shear, one of these defendants, recorded in the clerk's office of Leon county, book P., pages 359 and 617, and that the lowest estimate of the worth of the personal property is ten thousand dollars.

Defendant further says that the said pretended deed of January, 1878, was given not only utterly without legal and valid consideration as aforesaid, but that it was obtained from these defendants by an oppressive and fraudulent use of the mortgage, which the said Robinson had already obtained from these defendants, and by the false and fraudulent contrivances of the said Robinson and one Cora VanNess, the sister of the said Eliza E. Shear, by the aid of the said mortgage ; that after the said mortgage was

given these defendants no longer had control of their own affairs; that the said Robinson claimed that all their property was under his control, and that he took and held possession of all their said property, thereby rendering it utterly impossible for either of these defendants to obtain the means of living except through the said Robinson, and that they were utterly dependent upon him for support; that he and the said Cora VanNess, by false and fraudulent representations, induced the said Eliza E. Shear to leave Tallahassee, where they were then living, and go into the country, the said Robinson refusing to advance any more to the said defendants unless they would go into the country, where, they finally being persuaded by said false representations and threats of the said parties, concluded to go, and did go on or about the 30th day of August, 1877; that having gone into the country they were literally and absolutely at the mercy of the said Robinson and his co-conspirator, Cora VanNess. Having no means whatever, and no friends to whom they could apply for advice and assistance, that it was from absolute necessity, in order to procure means to live and be able to remove from the country, where they were subjected to the most cruel surveilance and constraint of the said Cora VanNess, and from the absolute impossibility of getting subsistence from any one else than the said Robinson, that induced them to execute the said pretended deed; that being absolutely in the power of the said Robinson, unable to live without his assistance, and virtually imprisoned in a sequestered place in the country, seven miles from Tallahassee, without the means of leaving said place without walking, unless by the consent and order of the said Robinson, and watched by the said Cora VanNess, the said defendant, LeRoy N. Shear, being reduced to a state of perfect helplessness of body in consequence of deprivation and sickness, and the said defendant being utterly

dependent upon her own exertions, and reduced to a perfect state of distress, both of mind and body, these defendants found it impossible to avoid the temptation of signing said paper with the inducement offered them of ($500) five hundred dollars, with which they would be able to provide for their immediate necessities and leave the place where they were enduring so much suffering; that it was understood at the time of the execution of said paper that it was intended as a security for the money already advanced by the said Robinson to these defendants, and the said five hundred dollars advanced to them at the time of the execution of said paper, and that the said Robinson gave to these defendants a written paper at the time the said pretended deed was executed for the purpose of showing that the said deed was intended for that purpose.

Defendants further allege that the said Eliza E. Shear did not acknowledge on the 4th day of January, 1878, or at any other time, upon a separate or private examination, separate and apart from her said husband, L. N. Shear, before a Justice of the Peace, or any other officer or person appointed by law to take such acknowledgement, that she executed the said deed, bearing date January 4, 1878, freely and without any fear or compulsion from her said husband; that the only acknowledgement she made to or before any such officer or person was before J. D. Pepper, a Justice of the Peace, in the presence of her said husband, in reply to the said Pepper, who asked her if she acknowledged the execution of said deed, or words to that effect; that the said deed, and everything connected therewith that she ever did was at one and the same time, in the presence of Mr. Malambre, Mr. Lester and Mr. J. D. Pepper and her husband, while they were all very near together, in the same room, and at the same table, and that she never was separately and apart from her husband examined by the

said Pepper, or any other officer or person, as to her execution of said pretended deed, having had no conversation with the said Pepper except that referred to in the presence of her said husband, Lester and Malambre.

Defendants further say that it is untrue as represented by the said Robinson in his said petition that these defendants, as soon as they were apprised of the facts set forth in said petition, executed to him the said instrument therein spoken of; on the contrary, the facts as set forth in said petition were never stated to these defendants by the said Robinson, and if they had been so stated these defendants could never have been induced by such a statement of facts as these to sign said paper; that the truth in regard to the execution of the paper referred to by said petition is that these defendants were informed by a letter from D. S. Walker, Jr., and E. M. Hopkins, in Tallahassee, of the sale of said property and the price for which it was sold, and that Robinson was the purchaser; and these defendants, knowing their rights in the premises, provided the sale was a legal and fair one, to the balance of the purchase-money after paying Robinson the amount of his decree of foreclosure, requested the said Walker and Hopkins, by a letter dated the 9th day of June, 1878, to represent their rights in the premises; that about the 14th day of June, 1878, the said Robinson came to the house of these defendants, at Cedar Key, Florida, and represented to them that the Hon. P. W. White, Judge of this court, had passed upon the rights of these defendants in the premises and decided that they had no just claims against the said Robinson. Robinson also stated that these defendants had been imposed upon by D. S. Walker, Jr., E. M. Hopkins and R. S. Williams by fraudulent representations in order to get the use of their names for the purpose of making money out of him, the said Robinson; and that the said Walker & Hop-

kins and Williams were endeavoring to black-mail him, and that it would be in the highest degree dishonorable for these defendants to allow the said Walker & Hopkins to proceed further, and for defendants to refuse to sign said paper. He also stated that the whole thing was a conspiracy on the part of the said Walker, Hopkins and Williams to defraud him. He stated to these defendants that unless said sale was set aside, certain creditors of theirs, whom the said Robinson had agreed to pay and had a mortgage against these defendants to secure him for so doing, would have a right to collect their money out of these defendants, and that they would be after these defendants like a pack of sharks.

Defendants further say that Robinson brought with him the said paper already written, and said that Hon. J. T. Bernard, in whom these defendants had the utmost confidence, had prepared it, and said that these defendants ought in honor to sign it. Robinson also showed to these defendants another paper purporting to be an opinion of the Hon. Geo. P. Raney, for whose legal opinion these defendants entertained the highest estimation, to the effect that these defendants had no rights in the premises; and these defendants, becoming convinced from the fraudulent representation of the said Robinson that the sale was illegal and fraudulent, and that it would be dishonorable to hold the said Robinson to it, they executed the said paper, understanding that said paper amounted to nothing more than an acknowledgment that they had no right to claim the balance of the purchase-money which the said Robinson had bid at said sale of the said property, because said sale was an illegal and fraudulent one; that the said paper was a very long one, and that they signed it without advice from any one; that they did not read said paper, but that the said Robinson pretended to read it to them; that he

did not read that portion of said paper which stated that the master was authorized to make deeds to the said Robinson; that they did not know when they signed said paper that it contained any such provision, and that what else of said paper that was read to them by said Robinson they considered to be simply an acknowledgment of the execution of said deed of conveyance made by these defendants to the said Robinson in January, 1878, which was meant to operate as a security of $3;336.91-100, which the said Robinson claimed to be due to him from these defendants; and that said paper was to be construed and understood in all of its provisions by the said conveyance executed as aforesaid in June, 1877; that is to say, that the nature of the papers were the same, and that the terms of sale and conveyance used in said papers were to be taken to mean the same, and to have the same force and effect as they had in the said conveyance of January, 1878; that the last mentioned conveyance being under the laws of Florida a mortgage, so the said paper referred to in the petition, as to its reference thereto, was intended to speak in the same language as to its legal effect, the one paper merely following the other and being construed by the other, and that such paper was executed without any consideration.

Defendants further say that the said paper mentioned in said petition, which said Robinson says was given by him to these defendants, stating that he would sell the property to Mrs. E. E. Shear, was in fact executed by said Robinson at the same time the said pretended deed was signed by these defendants, and that it was explicitly and perfectly understood and agreed by the said Robinson and these defendants that said paper should operate as a defeasance of said conveyance, and be evidence over the said Robinson's own signature; that the said conveyance was made for the purpose of securing the payment of $3.336.91-100, the con-

sideration mentioned in said deed, and the said paper was not destroyed by consent of all parties, but that the said Robinson fraudulently destroyed the said paper while at these defendants' house in Cedar Key on the occasion referred to, after he had pretended to make a true copy thereof at the request of these defendants.

To this answer petitioner made the following reply:

The petitioner, Robinson, replying to the answer of defendants to his petition to set aside the sale, says:

1. That the mortgage of August 1, 1877, was made to secure the note for $1,590 and such an amount of advances as, with said note, would or might amount to $2,000, and not to secure any other or greater amount; that such was the contract between the parties, and petitioner denies each and every statement to the contrary hereof made in said answer.

2. Petitioner denies each and every statement in said answer alleging or pretending that the said mortgage and the lease thereon referred to were one contract, or considered or made as one contract, but says they were separate and distinct contracts.

3. Petitioner says that the answer to the bill of complaint mentioned in said answer was signed on the 4th day of January, 1878, and not on the 10th day of January, A. D. 1878.

4. Petitioner denies each and every statement made in said answer to said petition alleging or pretending that said deed of January 4, 1878, claimed in said petition to have been executed and made and intended as a deed in fee simple, absolute, was made or intended as a security or mortgage, and not as a conveyance in fee simple, absolute, of the property covered thereby.

5. Petitioner further says that said deed, claimed by him to be a deed in fee simple, absolute, was made and executed

on the 4th day of January, 1878. Petitioner further says that all sums advanced and advances made by him, over and above $2,000, (including the said note for $1,590 aforesaid,) were not in fact covered by the security of the original mortgage agreement, and one of the reasons why petitioner refused to make any further advances, after having advanced the sum of $1,246.91-100 in addition to said note, was that he found that he had already advanced beyond such mortgage security, and had no security in fact for the same over and above an amount which, with said $1,590 and interest, would be equal to said sum of $2,000. Defendant denies that said sum of $500 was a loan or advance to defendants, but says it was a cash payment made under the agreement to sell said property in fee simple. And defendant denies each and every statement in said answer, and particularly in the fourth paragraph thereof, inconsistent herewith ; and further denies each and all the allegations made in said fourth paragraph of said answer.

6. Petitioner denies each and every allegation in said answer intimating that he made any false representations to his counsel.

7. Petitioner denies the sixth paragraph of the said answer, and the allegations in the seventh paragraph of said answer as to the value of the real estate.

8. Petitioner denies each and all the allegations made in said answer charging that said deed was given without legal and valid consideration, and says the contrary thereof is true ; and denies that the said deed was obtained by an oppressive and fraudulent use of said mortgage, or by false and fraudulent contrivance of petitioner and the said Cora VanNess. Defendant denies that he ever took or claimed to have the control or possession of any property of defendants, or either of them, illegally, or except under and by virtue of said lease or deed, and says that his possession

of the property covered by them was taken with the consent
of defendants and in accordance with the meaning and in-
tention of said instrument. Petitioner denies that he and
said Cora VanNess, by false and fraudulent representations,
induced said E. E. Shear to leave Tallahassee and go into
the country, and says if said Cora VanNess did so (which
he denies) he was not concerned in or a party to it. Peti-
tioner denies that he ever refused to make more advances
unless they would go into the country, or ever persuaded
them by false representations or otherwise to go into the
country. Petitioner may have advised them that it was
better for them to go into the country. Petitioner says
said deed was the free and voluntary act of the defendants,
and denies each and every allegation to the contrary made
in said answers, in so far as he or the said Cora VanNess are
concerned, or has or ever had any knowledge or informa-
tion, and denies each and every allegation in said answer
attributing to him in any manner any improper influence,
or the use of any improper means, or the taking advantage
of any necessities or suffering, or suffering condition of the
defendants, in the matter of said deed or contract of sale ;
but says it was an open, fair contract, and he never heard
any dissatisfaction with the same expressed or intimated
until after the first Monday in June, A. D. 1878. Peti-
tioner denies all that is stated between the word "that,"
in 9th line of 10th page, and the word "paper," on the next
to the last line of the 11th page.

9. Petitioner denies that he gave any paper to defend-
ants for the purpose of showing that said deed was in-
tended as a security, and says that the only paper given by
the said Robinson to them, or either of them, was the one
mentioned in the petition agreeing to sell said property
back to Mrs. E. E. Shear, and that this was not given till
after said deed had been executed, and was not a part of

the original agreement of sale, but was proposed, agreed upon and executed several days after the execution of the deed, and on the 10th day of January, A. D. 1878.

Petitioner says said deed was executed by said E. E. Shear freely and voluntarily, and that she did on a separate or private examination, before one J. D. Pepper, a Justice of the Peace, in and for Leon county, Fla., separate and apart from her husband, acknowledge that she executed the same freely, and without any fear or compulsion from her husband, and petitioner denies each and all statements made in said answer to the contrary hereof.

Petitioner further replying to defendants' answer, says that said instrument referred to therein as being executed in Cedar Key in June, 1878, was executed under the circumstances and for the purpose, and in the manner stated in an affidavit of petitioner, filed herewith marked "A," and any and all statements to the contrary thereof are false, and said affidavit is hereby made a part of this reply in so far as it relates to said paper, its meaning, purpose and execution, and the petitioner denies all statements in said answer concerning said paper, its meaning, purpose or execution to the contrary of the statement made in said affidavit.

Petitioner denies everything stated in the answer material to be denied, &c.

After the taking of testimony and filing exhibits an order was made referring the entire matter to the referee for trial and final determination. The referee made a decree which, on December 20, 1879, was duly entered of record, " that the sale be set aside and the complainant be relieved from the liability of his bid," and that complainant recover the costs of this proceeding.

From this decree the defendants appealed.

There were put in evidence before the referee the lease dated August 1, 1877, of the same real and personal prop-

erty embraced in the mortgage of the same date ; also a deed dated January 4, 1878, referred to in the foregoing petition and in the answer. The due execution of the same was acknowledged by Mrs. Shear, as appears by the deed, before J. D. Pepper, J. P., on the same 4th of January on which the answer to the foreclosure bill was signed and sworn to before the same Justice. The deed recites the execution of the mortgage of August 1, 1877, and proceeds: "And whereas, the said E. E. Shear and L. N. Shear are unable to comply with the terms of said mortgage, or to pay the said sum of money secured thereby, and they being willing and anxious to secure said payments, now this indenture, executed this the fourth day of January, 1878, between the said Eliza E. Shear and LeRoy N. Shear, her husband, of the first part, and William L. Robinson of the second part, all of said county and State, witnesseth that the parties of the first part, for and in consideration of the premises, and the said sum now due by said mortgage, and the further consideration of $1,746.91 paid by the said William L. Robinson to the said Eliza E. Shear and LeRoy N. Shear, the receipt of which is hereby acknowledged, they, the parties of the first part, have bargained, sold, aliened, confirmed and conveyed unto the party of the second part all the following described real and personal property," &c., followed by a description of the property and full covenants of warranty of title.

The following is a copy of an agreement written by Robinson, which Mrs. Shear testifies was executed and delivered on the same day, January 4, 1878, and which Robinson says was not executed until the 10th, some days after :

"GLENWOOD PLANTATION, January 10, 1878.

" I hereby agree to sell to Mrs. L. N. Shear my Glenwood plantation and household furniture as it now stands for the

sum of thirty-three hundred and thirty-six dollars, and full value for any improvements and all expenses of said plantation incurred in improvements or connected therewith, with interest at the rate of eighteen per cent. upon the sum of money so expended, up to the date of such sale, if made to them.                          W. L. ROBINSON."

Mrs. Shear testifies that the original was destroyed by Robinson in June, 1878, at Cedar Key, and that he copied or rewrote the above at the time, and that this is not an exact copy; that the rate of interest was sixteen and not eighteen per cent. in the original.

There was in evidence a paper executed by Mrs. E. E. Shear and L. N. Shear at Cedar Key, and acknowledged by her before a J. P. June 14, 1878, (referred to in the answer of Mrs. Shear) as follows:

STATE OF FLORIDA, }
    Levy County.   }

Whereas, we, Eliza E. Shear and LeRoy N. Shear, her husband, both of said county and State, did on the first day of August, A. D. 1877, execute to W. L. Robinson, of Leon county, Florida, a lease of the lands in Leon county aforesaid, purchased from Eliza and Joseph John Williams, of Leon county, said lease being for the period commencing August 1, 1877, and extending up to five years from January 1, 1878, said lands being more fully described in said lease; and whereas, in consideration of and to secure indebtedness to the said Robinson, we did mortgage said lands and certain personal property therein described to said Robinson, the said mortgage bearing date August 1, A. D. 1877; and whereas, on the 4th day of January, A. D. 1878, we made answers to a suit instituted in Leon Circuit Court to foreclose said mortgage; and whereas, on said last named day we did by deed sell and convey all our interest in said property of every kind, in fee simple abso-

26

lute, to said Robinson ; and whereas, upon advice of counsel it was deemed advisable that a decree of foreclosure and sale should be rendered in said cause, although we had fully, and for full and valid consideration received, sold to said Robinson all our interest, and that of each of us in said property ; and whereas, a decree of foreclosure and sale has been entered in said cause and in said decree dated the 31st day of January, A. D. 1878, it is directed that the balance of purchase-money, if any, over and above the amount payable to Robinson and costs, should be paid to said Eliza E. Shear, which was contrary to the rights of said Shear, or either or them, in view of the fact of said purchase by said Robinson ; and whereas, said property on the first Monday in June, A. D. 1878, was sold at public outcry ; and whereas, said Robinson not knowing it would complicate his position, in case he should bid more than the amount of said decree, principal and interest and costs, did bid the sum of eight thousand dollars for said property, said property having been run up by a party whom Robinson believed to have a desire to annoy him by so running it up, and said Robinson believing that he would not have to pay any bid he might make, however so large, and said property was knocked off to said Robinson at $8,000 ;

Now, therefore, being desirous that full justice shall be done in the premises, we, and each of us, do hereby consent that the sale so made shall be set aside by the Judge of the Circuit Court of the Second Judicial Circuit of Florida, and that the said decree shall be vacated and set aside, or, in lieu thereof, if the said Robinson shall prefer, we hereby direct the master, W. K. Beard, in said cause to execute a title to said property to said Robinson without requiring him to pay anything except the costs of sale and advertising ; and we do hereby forever disclaim having any claim, in law or equity, on said Robinson for said bid, and hereby

forever release him from all and every liability which may have arisen from said decree and sale aforesaid, it being understood that said decree is, in case said Robinson shall take a deed from said master, to stand satisfied, in so far as it decrees anything to be paid to us by said Robinson.

In testimony whereof, we have hereunto set our hands and seals this 14th day of June, A. D. 1878.

ELIZA E. SHEAR. [SEAL.]

L. N. SHEAR. [SEAL.]

As to the paper executed at Cedar Key, Robinson says, in his deposition dated August 1, 1878 :

Mr. LeRoy N. Shear returned from the North about this time in November, I believe. On one occasion after his return she proposed selling me the place and furniture, saying that the place had been of no profit to them, but a continual source of expense, and that as it was absolutely necessary for them to have some money to go somewhere, and go at something to make a living, that while staying here they were eating up all they had ; that by selling then they would have something to go away with, whereas if they remained they would consume everything, and be left here without a dollar among a people who had shown them no sympathy. This was the first time anything about a sale was said or passed between us. I suggested that they had better see Judge Baker, their counsellor, on the subject.; that he might be able so see some way out for them, and I furnished conveyance for them to go to Tallahassee to consult Judge Baker. After their coming to Tallahassee to see and consult with him they told me that they knew of nothing better for them to do than sell out entirely and get away from a place where there was no chance of their success in anything they might undertake. After several interviews and talks, in which the whole matter in all its

bearings was thoroughly canvassed, I concluded (and as I then thought more for their benefit than my own, and now I am thoroughly convinced of it,) to buy, and offered them five hundred dollars in cash, in addition to the amount they were owing me and I had assumed for them. This they accepted, being, I presume, more than they had reason to expect for such a place and furniture in such condition. They then proposed we should get Judge Baker to draw up a deed absolute to me for the property. There was considerable delay in getting the papers drawn up; as Judge Baker was away from Tallahassee about that time, I suggested that I would get some other lawyer to arrange the matter, but they said they preferred Judge Baker, as they had always employed him; that he was their friend. I of course had no objection to Judge Baker, as I know him to be a lawyer of position and ability. Judge Baker, who had drawn up all the papers in every transaction between us, suggested that as I had already a mortgage it would be as well to foreclose that, in addition to taking the deed in fee simple. The Shears made no objection to this when it was explained to them, and consented to the foreclosure, waived summons, &c., in order to make me as full and perfect conveyance as was possible for them to do; this was their intention and desire. I had no objection because I had every confidence in Judge Baker, and of course followed his directions. The agreement for the foreclosure of the mortgage and the making of the deed was one transaction, and the deed was executed and answer to bill signed at one and the same time, for one and the same purpose, that of making to me the strongest possible title to the property that the law afforded the means of doing—this was expressly understood by both the Shears and myself and Judge Baker. Their consent to the foreclosure of the mortgage was part and parcel of the title they were making to me, and

was so fully understood by them, and no other idea ever entered into their heads so far as I had ever heard until after the sale in June, 1878, by the Master in Chancery. Hearing that Mr. Edward Hopkins had written them after the sale that they could make something out of me, I went to Cedar Key to see Mr. and Mrs. Shear. I related to them just what had occurred; that I had bid $8,000 at the foreclose sale for the reason that R. S. Williams run it up on me for the purpose of annoying me. He told me after the sale that I should have paid him one or two hundred dollars to have him stop bidding. This I felt I had no reason to do, as I was bidding on my own property, which was only sold according to agreement to make most perfect titles. When I stated the facts to Mr. and Mrs. Shear they said they had received a letter from Eddie Hopkins, but could not understand it, as they had sold to me all their property, they could not see how they had any claims or interest whatever in the matter, and had so written him, and asking him to explain how they could have any claims. Hopkins' letter is as follows:

TALLAHASSEE, FLA., June 5, 1788.

*L. N. Shear, Esq., Dear Sir:* The fact that I have represented you in several cases before, and as well as on account of other considerations, suggests to me the propriety of writing to you in regard to the sale of your place, which took place on yesterday, Mr. W. L. Robinson buying it in for $8,000, your personal property being included in the said sale, and all covered by the above amount. Mr. Robinson's entire claim, as I understand it, is only $3,300 and something. If you will give me authority to represent you in the matter I will see if something can't be done in the matter and your interest protected. Please answer this immediately, if you wish me to look after your interest in the matter. As I understand it, there is a surplus over all

incumbrances, which you may be entitled to if I understand it right. I will look into the matter if you desire me to do so.

Both Mrs. and Mr. Shear assured me that our transactions had been of a most satisfactory and honorable character, and that they could and would not do anything to cause me trouble and annoyance about a matter already settled, as we had both intended it, and that even if by an error or quibble or mistake, they were in position to annoy me by an effort to extort money from me, that though poor they were not dishonorable, and could not become parties to any such dishonorable trick. They then showed me E. M. Hopkins' letter, and said I might keep it if I wished. I then told them that I was glad to find that even in adversity they were beyond the temptation of designing people. Mrs. Shear remarked that poverty was a great incentive to do wrong, but that she could not consent to wrong one who had on so many occasions been their friend. I then said you can by joining with Hopkins and Walker give me much trouble; or you can by giving me a paper repeating just what our intentions were, and directing the master to make me his deed without the payment of any money, and enable me to close up the matter without trouble. This they both consented to at once, assuring me that it was their earnest desire to carry out fully their contract just as was always understood between us, and to save all the trouble possible; that they would not only sign that paper, but would write immediately to Eddie Hopkins to stop all proceedings; that what he had already done was without authority from them, and that as for Eddie Hopkins' assertion in this letter that he had on several occasions been his lawyer it was untrue, except in so far that he (Eddie Hopkins) owed him (L. N. Shear) one hundred and fifty dollars, and that having exhausted every measure to

try and collect it, being sued by Dr. John S. Bond; he let Eddie Hopkins defend him, and that this was the only excuse he (Hopkins) had for claiming to have been lawyer for him in any way. Mrs. Eliza E. Shear then wrote a letter to Mr. Hopkins, which she read to me, and which I saw her put in the post-office. The substance of the letter was:

*Mr. Hopkins, Dear Sir:* Our, or my, transactions with Mr. W. L. Robinson having been of honorable and satisfactory character, we have no desire to open them. You will, therefore, stop all proceedings. With thanks for the kind interest you manifest in our affairs, I remain, &c.,

E. E. SHEAR.

This letter was read aloud to Mr. Shear and myself. I remarked that it was all right, as it expressed just what she wished. Mr. Shear remarked that it was entirely too courteous, that his (Eddie Hopkins') effort to induce them to become parties to a dishonorable trick deserved a reply which could not be misunderstood.

Since my purchase of the property I have been compelled to expend large sums of money to keep the place from going to ruin. The house was almost in a tumble-down condition; the fence gone, the cisterns out of order, floors rotten, the tin gutters and spouts leaking, and the water rotting the timbers, sills, joists, &c., the plastering fallen down from leaks in the roof, the window blinds rotten and falling to pieces, in fact the whole place in a state of abandon, dilapidation and ruin, and it still requires the expenditure of a large sum of money to render the place comfortably habitable, and put it in condition to yield enough to pay. Mr. Malambre has spent nearly all his time in repairing furniture and other articles of household necessity about the place, and is even yet not done. After the sale of the property to me in January last, Mr. and Mrs. Shear and family

remained as guests in the house until Mr. Shear's health should become good enough for him to travel and they could determine as to where they would go and what they should do. They remained for a considerable time. Mrs. F. S. Thompson, sister of Mrs. Shear, who lives in the city of New York, came to Florida for the purpose of seeing her sisters and making arrangements for their future, having been informed by Mrs. Shear that they had sold all their property in Florida, and were about going somewhere to engage in something by which to make a living.

After mature consideration, much talk and deliberation between Mrs. Thompson and the Shears it was decided that New Orleans was the best place for them, the Shears, to go, and that a newspaper and periodical business the best for them to undertake.

So one Sunday morning they took their departure, destination New Orleans.

The paper executed at Cedar Key was carefully read to Mr. and Mrs. Shear before it was executed, and after the whole matter of the master's sale had been explained. There was no verbal or other agreement proposed or entered into at all, or discussed. I told Mr. and Mrs. Shear that the property had been run up on me by R. S. Williams, as I then and now believe to injure me, and that believing the property to be mine I had bid $8,000 for it as advised by counsel, Judge Bernard, that I could do with impunity, and that I wished them to execute this paper for the purposes therein stated, and that it would be a great wrong upon me if they did not do so, or permitted me to be annoyed upon the suggestions of Mr. E. M. Hopkins. I did tell them that if it was attempted to make me pay the excess of money over the decree it would prevent my compromising outstanding claims against them which I had assumed, and agreed to give them the benefit arising from any compromise I might make.

I never stated that Judge White had passed upon their rights, or decided that they had no claims against me ; and never stated that they had been imposed upon by D. S. Walker, Jr., E. M. Hopkins and R. S. Williams by fraudulent representations in order to get the use of their names to make money out of him. I did tell them that they, the Shears, knew that they had sold me the property in fee simple, and I also said to them that I thought that Hopkins and Walker were trying upon the basis of some expression in the deed to influence them to litigate the matter, so that they, Hopkins and Walker, might make some money out of it. I did tell them that it was Mr. Raney's opinion, from my statement of the case to him, that I had a good case ; and I did show them his letter to me containing that opinion. Mr. Raney's opinion filed in the case is as follows :

*W. L. Robinson, Esq., Dear Sir :* I have examined the deed of January 4, 1878, made by L. N. Shear and wife conveying land in Leon county, Florida, and certain personal property, and it is my opinion that your ownership of such property, particularly under the circumstances detailed by you and Judge Bernard as attending the transaction, can be maintained, and that you can successfully defend yourself against an effort to compel you to pay any *money* on the bid made by you at the sale of said property on the first Monday in June by W. K. Beard, Master in Chancery.

Nothing was said at Cedar Key by Mr. or Mrs. Shear indicating that they had any understanding of the purpose or intent of said paper executed by them at Cedar Key other than its plain language imports. Being perfectly willing, as I still am, that Mrs. Shear should still have the privilege of purchasing back the property granted her by the agreement January 10, 1878, I did, while at Cedar Key at his,

L. N. Shear's, request in the presence of Mrs. Shear, upon his handing me the original agreement, which was much worn and stained, having been apparently at some time wet, make a new copy of the same and leave it with them, destroying the original in their presence.

E. J. Lutterloh, the J. P. before whom the paper was acknowledged at Cedar Key, testifies that Robinson came to him and wanted him to certify some papers, and would return with Mrs. Shear at nine o'clock, and said he had the paper all ready. About ten o'clock that night Robinson sent for me, and I went to Mrs. Shear's door. Robinson said he was not ready, wanted to have some further conversation with these people. About eleven and a half o'clock Robinson sent for me, and I went to Mrs. Shear's, and all I heard then or at any other time was in the presence of Mr. and Mrs. Shear and Miss Burkhim. Robinson stated, after reading over the paper, that he had loaned these people some money and taken a mortgage on their lands; that subsequently he had bought this land from them and took a deed; that subsequently, to strengthen his title, he foreclosed the mortgage, and at the sale under a decree a personal enemy run it up on him to $8,000. That an attorney had interfered by claiming to represent Mr. and Mrs. Shear; that this action of the attorney had injured the reputation of the Shear's for honor and fair dealing, and the paper they were to sign was to set them right in the estimation of their friends, as also to settle Robinson's rights in the matter. I was convinced by his representations that they had no honest claim against him, and no claim that could be enforced in law or in equity. Robinson said a good many things as he read, or pretended to read, the paper, afterwards signed by Mr. and Mrs. Shear, by way of explanation as he went along, tending to show that honesty and fair dealing required that they should sign

the paper. When the paper was presented for signature, Mrs. Shear asked some questions about its length, and Mr. Robinson's reply was indifferent. She asked something about time, and Robinson said, " as long as you want," or something to that effect, but I did not know to what they referred. I was not advised of the character of the papers. Robinson wrote or copied a short paper. We witnessed both that and the other that was signed by the Shears. Miss Burkhim was the other witness. After Mr. and Mrs. Shear had signed the paper that Robinson requested them to sign Robinson wrote another paper. I don't know of my own knowledge whether it was a copy or not, and have no knowledge of its contents, it was not read and nothing was said of its contents. The paper was a short one, drawn or copied by Robinson, after everything else was signed and finished, and none of us, as I said before, were advised of its character. In fact I thought Mr. Robinson did not want me to know what it was, and avoided anything that might appear like a disposition to learn. When the paper was presented for signature Mrs. Shear asked some questions about its length, the reply by Robinson I forget ; but it was indifferent. Mrs. Shear asked something about time, and Robinson said as long as you want, or something to that effect, but I did not know to what they referred. It was an hour or more from the time I first went to Mrs. Shear's house until Robinson sent for me the second time. I signed both the paper that Robinson wrote and signed and the paper that Mr. and Mrs. Shear signed ; as a witness to both, and also Justice of the Peace to the second. Before any paper was signed, and while reading the first long paper, Mr. Robinson, in speaking of the enemy who had run the land up on him, said that this enemy had run it up on him to twice its value, knowing that he (Robinson) was obliged to buy it. That really the present value of the land sold was not half the amount it sold for.

SUPREME COURT.

Shear v. Robinson—Statement of Case.

The following correspondence between Lutterloh and Mr. Raney appears in the record:

TALLAHASSEE, FLA., June 18, 1878.

*E. J. Lutterloh, Esq., Cedar Key, Fla.:*

DEAR SIR: I notice that you are a witness to certain papers executed by Mr. and Mrs. Shear to W. L. Robinson of this place. Mrs. Shear is here now endeavoring to impeach the validity of the execution of the same. I write to know from you whether they were executed squarely and fairly; and if everything done in your presence concerning the same was not done fairly. Please answer immediately. Very respectfully,

GEO. P. RANEY.

CEDAR KEY, June 20th.

*Hon. Geo. P. Raney, Dear Sir:* Your favor 18th received, and in the matter to which you refer everything that was done was fairly done, if Mr. Robinson's statement of facts was correct, and to this both Mr. and Mrs. Shear assented.

Robinson's statement was, that he had loaned Mr. and Mrs. S. money and taken a mortgage on land; that before the money loaned was due he bought from Mrs. and Mr. Shear the land that was mortgaged to him, and took a conveyance; that recently to strengthen his title he had filed a bill to foreclose the mortgage on this land, got decree, advertised, and sold, and some one run the land up on him and made him pay more than its value, and perhaps double the amount of his mortgage. The excess over the mortgage properly belonged to him, as Mr. and Mrs. S. had no interest whatever in the land, and the papers executed were for the purpose of relieving him from the payment of this excess. If these statements were true, and Mr. and Mrs. S. said they were, everthing was fairly done. Robinson

read over, or pretended to read over, to Mr. and Mrs. S. every paper before they signed, and his explanations were very full, and appeared to be well understood by the parties. I was present two hours perhaps, while the papers were being read and executed.

If I can give you any further statement on any particular parts of this matter let me hear from you.

Very truly yours, E. J. LUTTERLOH.

Delia Burkhim testified that she witnessed a paper Mrs. Shear had requested Mr. Robinson to copy. Heard Robinson say at the time that all he wanted was the money Mrs. Shear owed him, and if she paid him in five or twenty-five years he would be satisfied, or words to that effect. She could not remember the exact words, but her impression of the matter was that Mrs. Shear owed Robinson money, and that this paper was written for the purpose of showing that Mrs. Shear had a right to redeem the property, to which Robinson claimed to have a deed to, whenever she paid the money due from her to Robinson within five or twenty-five years.

Mrs. Shear testifies as follows in respect to the execution of the paper at Cedar Key:

That on Friday night, the 14th of June, 1878, Mr. W. L. Robinson came to her house at Cedar Key, Florida; that she was not at home, and that he went to Way Key where she was; that he took her in a boat and she went with him to Cedar Key. He had previously had a conversation with my husband and gone after a Justice of the Peace. Mr. E. J. Lutterloh, the Justice of the Peace aforesaid, came in a short time after I got there. I went to the door, and he said he called to see Mr. Robinson. I went back and told Robinson, who went to the door. Shortly after the Justice left. As soon as Robinson and I got in the house he produced a paper which he said he wanted me to sign, and

which he said had been prepared by Mr. J. T. Bernard, and also a paper which he said was an opinion by Geo. P. Raney. I read the paper which he said Mr. Raney had prepared, the contents of which was about to this effect: that the deed that Robinson claimed to have been given to him by me was good, and the general tenor of the paper, which I can't remember, was that I could recover nothing from Robinson derived from the sale, it being a fraudulent one, no good accruing from it to me. The other paper which Robinson read to myself and husband was quite a long one, the contents of which it is impossible to remember, but the impression made on me on hearing the paper read was that by signing it I would relinquish all claim that I might have against the said Robinson, which was due to me by virtue of the foreclosure sale, or rather that by said paper I acknowledged that I had no rights acquired under the said sale, but I did not understand said paper to mean that I would, by signing it, relinquish my right to redeem my personal property and plantation at any time, upon paying the said Robinson the sum of three thousand three hundred and thirty-six dollars mentioned in an instrument of writing made by me to the said Robinson in January, A. D. 1878. My understanding of the whole matter from Robinson's representations and these papers, was that by insisting upon any rights under the foreclosure sale I would do Robinson an injury, as I had no legal claim against him under said sale, and that by signing the paper I merely relieved him from unnecessary expense in consequence of his having to bid eight thousand dollars, and he also persuaded me that it would be dishonorable for me not to sign the paper. After reading the said paper the said Robinson commenced to talk to me about signing it; he told me that Judge White told him that there was no necessity to foreclose the mortgage, since he already had

a deed to the property and there was no use in having a double title. He then went on to say why he foreclosed, and it was to this effect: All that he could save of the purchase-money, after deducting what I owed him, he would pay to me instead of certain persons to whom I owed money, Robinson having assumed to pay these debts for me in consideration of a mortgage which I had previously given to the said Robinson; that it made no difference to him, that he would as soon pay me as them. I replied: You agreed to pay these people, and you ought to have done it long ago. I told him that it would not be right, and that I would not agree to any such thing. He also said that Judge White told him that the money over and above his mortgage that he bid would go to him, Robinson, because he, Robinson, represented me, and would receive the money as owner of the place, and he would pay me the money as stated instead of paying to persons whom I owed, such liabilities having been assumed by him. He many times quoted Judge White, and stated that the conversation occurred in court; that Judge White took up the deed and said to him: Robinson, you have this, what do you want with any more? He also impressed upon my mind that it was nothing more than a black-mailing operation on the part of my attorneys and Robert S. Williams to extort money out of him, insisting that it was in the highest degree dishonorable for me to further pursue any proceedings against him in order to require him to pay the money he bid at said sale, always telling me that the proceedings did not affect my rights in any way, and that all he wanted was the money I owed him, and that when I paid it in five or twenty-five years he would be satisfied and relinquish all right to the property; and that he was doing everything in the world for my benefit; and that if the sale was not set aside that all the persons whose claims Robinson had

assumed to pay would set upon me like a set of sharks, and that all that he was doing was for my benefit. Becoming convinced from all these representations of the said Robinson, and having no one capable of advising me, I finally agreed to sign the said instrument of writing above referred to, which I presume was a relinquishment of all claims against Robinson derived from said sale. Deponent further says that said Robinson is indebted to her in the sum of about four hundred dollars, this amount having been assumed by the said Robinson, but I having subsequently effected a settlement of the same, thereby relieving Robinson of the obligation he had assumed to pay. This debt of four hundred was due by me upon a judgment against me held by Cooper, of New York. The said Robinson owing me this money, and never having disclaimed the debt, I insisted upon his paying me. He did pay me one hundred dollars some time after I signed the said paper. There was not the slightest understanding between the said Robinson and I that the said money was paid to me in consideration of my signing the said paper. On the contrary, the said Robinson said that he had brought the money for the purpose of paying it to me as a part payment of what he owed me. Deponent further says : I never should have signed said paper if I had not been convinced, from the misrepresentations of the said Robinson, that I had no rights in the premises, and that it would be dishonorable for me to pursue him. I signed the paper without the slightest consideration, solely upon such misrepresentations. Deponent further says that she gave for her said plantation, which was sold at said foreclosure sale, to the best of her recollection, about thirteen thousand dollars ($13,000); that the value of the personal property, which was also sold, was at least ten thousand dollars ($10,000); and that the freight which she paid for its transportation here was over

one thousand dollars ; that the large portion of said furniture having been but little used, and of a character not to be injured by use, is now almost. as good as new, a large portion thereof consisting of very valuable paintings, mirrors, fine book-cases, most valuable books, consisting of more than two thousand volumes, elegant bed-room and parlor furniture, which cannot be repaired without great abuse, and a very large number of the finest and rarest clothes, ornaments and fancies.

Deponent further says that she neglected to state, when speaking of the conversation between herself and Robinson at Cedar Key, " that a certain paper given by the said Robinson to her, dated January 10, 1878, for the purpose of putting in writing evidence to the effect that a certain instrument of writing, made by her to the said Robinson in January, A. D. 1878, was not a deed in fee simple, but an instrument made to secure the payment of money owed by her to said Robinson, having been wet and thereby impaired, the said Robinson agreed, at the request of this deponent, to make a copy thereof. He pretended to make a copy thereof. I took the original and laid it under a paper on the counter shortly after Robinson had pretended to copy it; without my noticing him he took the said original, and, without saying anything to me, destroyed the same by tearing it in small pieces. I did not know that he was destroying it until he had thrown the small pieces on the floor. I did not read the paper until the next morning, when I found that he had not made a true copy of the original, but had changed it so as to make me liable, before I could redeem, to pay for all expenses of said plantation incurred in improvements thereon, with interest at the rate of eighteen per cent. My recollection is that I agreed to pay him only sixteen per cent., and it was stated in such original paper, and also the conclusion of such pre-

27

tended copy, to-wit: the words, 'up to the date of such sale,' if made to them, were interpolated. This copy was signed as witnesses by E. J. Lutterloh and D. G. Burkhim. The witnesses did not compare the original with this pretended copy. I never was informed by Robinson or any one else that my property was advertised for sale, although I had received several letters from Robinson within a month previous to said sale. Robinson appeared to be exceedingly anxious to know how I had received the information that the property had been sold previous to his writing to me about it."

LeRoy N. Shear testified as follows in regard to the paper signed at Cedar Key: That he, on the 14th day of June, 1878, signed a paper presented to him by William L. Robinson at Cedar Key, Florida, which said paper the said deponent understood to be, and was represented by the said Robinson to be, a relinquishment of this deponent's and his wife's, Eliza E. Shear, of all right they had to claim from the said Robinson certain money which the said Robinson had bid at the sale by the master of certain property belonging to said deponent's wife on the first Monday in June, 1878, in the City of Tallahassee, under a decree of foreclosure in favor of said Robinson against the deponent and his wife; and that the deponent was induced to sign said paper by the false representations of the said Robinson that the said sale was an unfair and fraudulent one, and that one R. S. Williams had run up said property for the purpose of defrauding the said Robinson, and that certain attorneys in Tallahassee, who were pretending to represent the interest of this deponent and his said wife in procuring the said money from the said Robinson, were merely engaged in a black-mailing operation against him, the said Robinson, and that the whole matter was merely an attempted swindle on the part of the said R. S. Williams

and the said attorneys, D. S. Walker, Jr., and E. M. Hopkins. Deponent was also led to sign said paper by the representations of the said Robinson that Judge P. White had said that this deponent and his said wife had no rights in the premises, and were not entitled to the said money that Robinson bid at said sale, or any part thereof, since the said Robinson already had titles to the said property, and there was no necessity for it to be sold under the mortgage. Robinson also said that unless the said sale was set aside Mrs. Shear's creditors could collect out of him the debts Robinson had agreed to pay for her. Deponent also says that Robinson brought with him to Cedar Key this said paper already prepared, and said that Judge J. T. Bernard had prepared it, and that the said Bernard had said that it was the proper paper for this deponent and his wife to sign, and that it would be dishonorable for them not to do so. He also brought a paper which he said was an opinion of the Hon. G. P. Raney, which was to the effect that this deponent and his wife had no rights in the premises ; and it was in consequence of these false representations and surrounding circumstances that induced him and his said wife to sign the paper, and that in signing it this deponent understood it to be nothing more than a confirmation of a conveyance made by himself and his said wife to the said Robinson in January, 1878, which said conveyance was made for the purpose of securing to the said Robinson the payment of $3,336.91-100, which he claimed to be due him from deponent's wife, and for the further purpose of acknowledging that these deponents had no right to claim anything from Robinson since the sale was a fraudulent one, and the said Robinson ought not to be held to it ; that this deponent did not read the said paper ; that it was quite a long one, but that the said Robinson pretended to read it to him and his said wife, but that he did not read that por-

tion of said paper which authorizes the master to make deed of said property to the said Robinson ; that said deponent did not know when he executed said paper that it contained any such provision, and would never have signed it had he been so informed ; that the said paper was executed without any consideration whatever, either to him or to his said wife, and it was merely to prevent, as he thought, Robinson from being cheated and defrauded, he being convinced that he and his wife had no legal and equitable rights against Robinson in the premises.

Mrs. Shear, in the deposition of 19th of June, 1878, says that when Robinson came with the Justice (Pepper) and others, on January 4, he took her into a room and told her he wanted her to understand so that there would be no objections before these other persons who came as witnesses ; that if I had any objections he wanted her to make them there in that room ; that he did not want any discussion of the matter or any objections before the witnesses when she went to sign the paper. She replied to him : " What objection can be made ? I suppose we all understand the matter." * * * He then, for the first time, informed me that the paper he wanted me to sign was a bill of sale, and not an agreement to foreclose the mortgage. I then told him I would not sign it in that form. He persisted in my signing it, and refused me aid unless I would sign the paper. Being at this time reduced to the most dire necessity, my husband sick and unable to turn in bed, I not having one dollar in four months, and suffering for the necessaries of life, * * * and having no other recourse, without a friend, I finally agreed with said Robinson if he would give me an agreement, in his own hand writing, to the effect that I might redeem my property by paying him the amount mentioned in said instrument, I would sign it. This he agreed to do. The paper being signed, and the

witnesses having gone, Robinson then sat down and wrote, an agreement and signed it, and handed it to Mr. Shear. I had this agreement until the 14th June, 1878. Robinson then and there expressed himself that this instrument of writing was intended as evidence that the paper which I had signed was only meant as a security for the money mentioned, and as evidence that I could redeem my land and personal property at any time. The $1,700 and upwards, mentioned in said paper which I signed as aforesaid, which Robinson claims to be a deed in fee, I considered as advances made under an original contract, except the $500 which necessity and privation forced me to take under circumstances already narrated.

J. A. Malambre testified that he was a witness to the deed. Soon afterwards Robinson told Mrs. Shear she had sold all her property except her wearing apparel. She expressed regret that some articles were included, but consoled herself with the understanding that she might redeem them in a certain time. The house and furniture were dilapidated. His affidavit also states that he, deponent, has since, on several different occasions, heard Mrs. Shear express regret that she included in the sale certain articles which she appreciated more on account of association than their money value, but she consoled herself with the understanding that she might redeem them in a certain time. Deponent resided and lived in the family mansion, eating at the family table, and Mrs. Shear was much of an invalid, and the direction and control of the house-keeping was left to Mrs. VanNess, and it was the impression of deponent that this was the choice or desire of Mrs. Shear, and deponent never heard any objection to it or any expression of dissatisfaction or complaint about the same until after the sale above mentioned. There was always plenty to eat of the best quality, according to the manner in which good or

422 SUPREME COURT.

well-to-do people live in Florida; * * * that when W. L. Robinson took possession of the " Glenwood " property, in Leon county, mentioned in the affidavit made by deponent on the 20th of June, 1878, and since the deponent has been on said place, that he, Robinson, has made great improvements; that nearly every piece of furniture has been repaired to a large extent; that said furniture was in a very bad and broken condition, and some of the same is still in a bad condition—marbles being broken, and it being otherwise damaged and being stained ; that the house has been repaired, new sills put in the porch above and below, floor taken up and renewed, joists renewed, pillars repaired, tin work renewed about chimneys, gate-way and pailing repaired, new steps built to the house, two miles of plank fencing built, one cistern built, another repaired, the pumps have been repaired. The bulk of this repairing has been done since January 3, 1878. The roof to the house has leaked ever since deponent has known it.

John D. Perkins estimates the value of the Glenwood Plantation at one dollar per acre, exclusive of the dwelling-house and surroundings. The land is of small value on account of nut grass. A plantation in this county, free from nut grass, with a gin house and good cabins on it, is estimated at $4 per acre.

Dr. A. B. Hawkins testified that he is somewhat acquainted with Glenwood Plantation. Went with Mr. Shear when he bought the place of Col. Williams. The place is worth about $3 per acre, including the improvements. Land studded with nut grass is not worth more than $1 per acre.

G. A. Chaires says he is familiar with the Glenwood Plantation, and it is not worth over $2 per acre on account of having nut grass on it. The land is old and much worn. Williams wanted to get rid of it on account of the nut grass among other reasons. He had rather pay $10 per acre for land without nut grass than $2 for land with it.

R. C. Parkhill would not give more than 50 cents per acre for the place leaving out the dwelling-house—it is covered with nut grass. The dwelling-house before Robinson made repairs was not worth more than $1,000, or about that. Thos. W. Carr, N. W. Eppes, F. W. Isler and W. J. Johnson agree with the estimated value as made by Parkhill. Their affidavit is as follows:

Personally appeared R. C. Parkhill, Thomas W. Carr, Nicholas W. Eppes, William J. Johnson, Frederick W. Isler, and they being duly sworn say each for himself that he has been a farmer in this county for upwards of thirteen (13) years, except said Parkhill, who has been a farmer here for the last seven years, and the said Johnson, who has been a farmer here for upwards of six years, and each of them has lived in said county more than 20 years; that they are familiar with the lands and plantation and premises, including improvements, in this county, known as " Glenwood," now occupied by W. L. Robinson ; that said plantation and improvements thereon have also been carefully inspected by them this day, having ridden over the plantation and gone through the house. The said Parkhill says that the land is full of nut grass, nearly covered with it; that the land is poor, even if there was no nut grass; that for farming purposes he would not give more than fifty cents an acre, leaving out the dwelling-house; has never seen any land more fully covered with nut grass. The dwelling-house, considering its condition before Mr. Robinson made repairs on it, was not worth more than $1,000, or about that sum. The said Thomas W. Carr says that he agrees with the statement made above by said Parkhill, except that he thinks the valuation of the dwelling too liberal. The said N. W. Eppes says that he thinks the said estimate of Parkhill the full value of said property ; and said Isler and Johnson also say that said

estimate of Parkhill is the full value of said place for farming operation. Deponents furthers say that there is no timber of any value for fencing or farming purposes on the said lands, except a small quantity of timber on the branch, consisting of green and old field pines. The land is very old and much worn. Deponents have lived in this county for many years, each at least twenty years; that they consider three thousand dollars for the land and improvements and personal property in the dwelling as a very large price for said property, and more than it is worth for any purpose it can be used for in this county. Said plantation has always had the reputation of being very much injured by nut grass. Deponent Isler says that this place has had nut grass for the last thirty odd years, and he has known the land since before it was cleared. Deponents further say there is no gin-house nor any screw on said land, nor any fence on the same—except a new fence made by Mr. Robinson—the out-houses are in a dilapidated condition. The deponent, Isler, says that he has been farming in Leon county about 40 years, and the Burgess Town Place, sold by F. R. Cotten to W. R. Wilson in 1878, at about $2.90-100 per acre, is worth more than six times as much per acre. Johnson says that the Kirksey Place, purchased by Saxon & Dickenson in 1877, at about $3.50 per acre, is worth more than six times the said Glenwood Place per acre. Deponents further say that they do not believe that farming operations can be carried on successfully and profitably on said " Glenwood " Plantation.

Geo. Damon had inspected the furniture in the house at Robinson's request, and estimated its full value at $754.-75-100.

Mary E. Risley testifies that in November, 1877, Robinson came to her and requested her to " prevail on Mrs. Shear to sell him the place for $900 ; that it was the best

thing that she, Mrs. Shear, could do, as she had gotten all the advances that he had agreed to make, and that he was now providing her gratuitiously." She spoke to Mrs. Shear about it, and she said she had ridden in from the country with Robinson that morning, and that he had asked her to sell; and that he had talked business to her until she was almost wild. When witness told Mr. Robinson that he had better speak to Mrs. Shear himself, he said that he, holding the papers, could not do so.

Charles C. Pearce says that he went over the place very recently with Mr. Robinson, P. Houstoun and James Donelson, and visited six crops Mr. R. had on the place of corn, cotton, potatoes, &c. They compared favorably with other places on the road. Thinks the plantation as good as any between Tallahassee and Earle & Perkins', adjoining. Nut grass is injurious to cotton, but does not materially injure other crops. I cannot say what the plantation is worth because I do not know. It was the conclusion of the committee not to place money valuation on the plantation. The circumstances under which sales were made were so different that we did not feel competent to place money valuation on it. We thought no one competent to price others' property. We did not know whether we should put a forced sale price or a fair sale price, and therefore did not value it at all. I own a plantation in this county; I have nut grass on about one hundred acres of my place, the balance has no nut grass, or not much. So far as the land is concerned, Mr. Robinson's, or the place in question, averages as good as mine; that is, it will produce as well. I have about 200 acres of wood land on my place, which would of course make it more valuable with the location, being nearer the City of Tallahassee. I only went in the lower part of the house; four rooms were furnished. I noticed some of the furniture because it was pretty. The library, I should

think, occupied about ten feet square on the wall. I have not the least idea of value of the library or contents. Mr. Robinson told me he was getting 800 pounds lint cotton as rent to each mule, and there were six mules. I hold my place at ten dollars an acre, but I don't care to sell at that, particularly as I am getting rents that pay me better; but would sell at that if I could get all in cash so as to make another investment. The average rent of land in this county for as much as one mule can work is from 500 to 900 pounds lint cotton. I can answer as to how I estimate the value of lands in the county no other way than by what interest it can be made to pay by management. If good management it can be made to pay a good deal; if badly managed, not much. I look upon renting as the only safe way for planters to work to make money, while it is injurious to the land. Robinson told me he was getting 800 pounds lint cotton to the mule, and there were six mules. So far as the land is concerned the place averages as good as mine; will produce as well. I hold my place at $10 per acre. The average rent of land in the county for what one mule can work is 500 to 900 pounds lint cotton. The main building could not be put up for less than five or six thousand dollars, and the out buildings would cost about $1,500. These lands, at forced sale, might not bring over two or three dollars per acre; at private sale might bring six or eight dollars. Mr. Robinson said the place would compare favorably with other lands around except for the nut grass.

Lewis Austin says he has lived on the place 16 years, and rents about 35 acres, and pays 800 pounds of lint cotton as rent. There are seven renters beside me.

Frank Pemberton rents 35 acres of the place, and pays 1,000 pounds lint cotton. There are seven other renters on the place. One other pays 1,000 pounds, and the others 800 pounds, as rent for same quantity of land.

James B. Donelson went over the place with Robinson, Houstoun and Pearce. Thought this compared favorably with other plantations adjoining, except for nut grass. Those crops which had been well cultivated were fair crops; compared favorably with those I saw in riding there. Taking the crops as a whole, cotton and corn, they would average equal with other crops around. The value of the plantation is about the same as the rest around there, but for the nut grass. Land that rents for 800 pounds lint cotton for each 40 acres is pretty valuable land ; it is a high rent. Mr. Robinson said he thought it would cost $10,000 to build such a house. I thought it worth now four or five thousand dollars.

P. Houstoun was with Robinson, Donelson and others over the plantation, and says: I agreed with the opinion Mr. Robinson expressed as to value; that it was of average quality with places in the vicinity, the difference being that there is nut grass on it. Land that will rent for 800 to 1,000 pounds of lint cotton for such quantity as one mule will work ought to be worth from $12 to $15 per acre. The crops where they were well worked on the Glenwood Place were pretty good; about equal with other crops on the road. Estimate that 1,000 pounds lint cotton is worth $90, a mule will work about 30 or 33 acres, this would be $3 an acre rent, which would be a good rate of interest on $12 or $15. I know so little about the facility of renting out lands in that neighborhood that I cannot answer as to its value, or as to its being worth $12 or $15 per acre ; but if the whole place can be rented at the same rate as the parts cultivated this year are rented at, it would be worth $12 to $15 per acre, and perhaps more, considering the elegant residence on it. I don't know how the place is off for wood.

*Question.*—Do you know of any plantation of like quality,

age and quantity with the Glenwood Place selling at $12 to $15 per acre?

*Answer.*—I don't know of any sale having been made that will suit these three conditions of quality, quantity and age. I am not familiar with the sales that have been made; never attended any of them, and don't think I could say. I mean the Glenwood Plantation would be worth $12 to $15 per acre if it could be filled up entirely with renters at 800 to 1,000 pounds of lint cotton every 33 acres.

Judge Bernard testifies in behalf of the complainant that he attended the sale as solicitor for the complainant, and that at the sale R. S. Williams was a bidder, and bid up to $7,900 for the property, complainant then bidding $8,000, and the property was then knocked off to him; that after the sale he met Williams, who stated that having consulted counsel he was satisfied Robinson could only claim the amount of the decree and costs, and that he had intended to bid for certain parties as high as five thousand dollars, but if Robinson had taken him aside and promised him a couple of hundred dollars he would not have given him any trouble; that it was a common thing for parties to buy in property at public sale and be paid $50 or $100 for their bargain. Afterwards Williams said he understood Robinson was angry with him for running him up the property, but that he ought not to be, as Robinson himself had done the same thing for him on one occasion, and if Robinson had taken him aside and paid him one or two hundred dollars it would have been all right.

Thomas J. Perkins testified that he asked Williams why he had run up the property, and Williams answered: " Why did not Robinson call me aside and offer me one or two hundred dollars?"

R. S. Williams testifies that he was a bidder at the sale for the purpose of buying the property; that he had in-

quired into the character of the title to be acquired by such purchase, and bid thereon $7,900 in good faith, and gave Robinson no reason to believe otherwise, and he deemed the property worth the amount, and was willing and prepared to pay the amount of his bid for it. He was abundantly able to pay, and he had no intention to annoy Robinson by bidding.

Julius Diamond testifies that he was present at the sale; that he heard Williams inquiring particularly about the titles to the property, and before the sale heard him express a desire to purchase it. Williams is perfectly good and solvent, and abundantly able to pay the amount of his bid.

M. Lively testifies that he was present at the sale, and heard Mr. Williams ask that the sale be stopped awhile that he might inquire into the title. The master referred him to the decree. Robinson and Bernard were standing near enough to hear.

Bolling Baker testified that he was employed by the parties to draw up the mortgage and the lease referred to, dated August 1, 1877. Understood from Mrs. Shear that as she was embarrassed and could not carry on business without aid, and Mr. Robinson having made some advances, reluctantly entered into the matter, and said that if he took the mortgage he would not be able to indulge her longer than the time expressed in the mortgage, as he could not well afford to spare the money from his business. Mrs. Shear meantime intended to live on the place, and not being able to carry on the plantation would, by renting it, have something for support until she could sell. Afterwards Robinson having advanced more than the mortgage secured, and a sale having been agreed on both parties employed him to draw up a deed of conveyance, which he did and sent it to Robinson from Orange county in December,

1877, with a bill to foreclose the mortgage, with directions to Robinson to fill in the amounts of money consideration. Understood from Mrs. Shear and R. that this deed was intended to carry out an agreement for an absolute sale of the property. Did not advise the foreclosure of the mortgage, but acquiesced in it.

He says: I became acquainted with defendants, Shear and wife, shortly after their removal to Leon county, Florida. I have known plaintiff slightly for several years. They all reside in Leon county. I prepared a mortgage about the 1st August, 1877, at the request of plaintiff and defendants, and signed my name as a witness thereto with Judge Rippey, and I believe the paper annexed is a copy of said mortgage. I know very little about the negotiations which led to the execution of the mortgage. I had never been employed by plaintiff as counsel or attorney in any of his business. Plaintiff came to my office in Tallahassee and said that Mrs. Shear requested me to go with him (Robinson) to her store near Gallie's, in Tallahassee. This was, I think, in the latter part of July or 1st August, 1877. I went to the store (Robinson having preceded me); I found them, the defendants and Robinson, and there were several other persons about the room, but not immediately present but within hearing. I was informed by defendants that they had been negotiating with Mr. Robinson for a loan in order to pay off some pressing demands against Mrs. Shear. They had already agreed upon the terms, and had desired me to act for both parties in completing the transaction. A number of questions were asked by plaintiff and defendants, and I explained fully the legal effect of what was proposed to be done. The interview lasted for, I think, some two hours, during which time the affairs were freely discussed and without reserve. Mrs. Shear repeatedly stating that she could not carry on her business without pecuniary

aid, and plaintiff as often stated that while he was willing to aid her yet it was exceedingly inconvenient to him to spare the money, as he was compelled to keep all of his money in his own business, and that if he took the mortgage and made the advances he would not be able to indulge Mrs. Shear longer than the time expressed in the mortgage ; that he would greatly prefer that some one else should have been selected to assist her, but that he was willing to aid her to the extent of his power, but could not afford to carry the burden of such a loan any length of time, as it would embarrass his own business, and that it must be distinctly understood that he would be compelled to enforce the repayment of his advances according to the terms of the proposed mortgage. The result of this interview was a request from Mrs. Shear to me to draw up the mortgage, and I made a memorandum in writing of the terms, and read it over to all the parties before I left the room, and I afterwards prepared the mortgage at my office. At the time of this interview there was a list of the debts made out which plaintiff was to pay, and the amount stated in the mortgage was the sum of these several amounts. Robinson, always when I was present, insisted upon a strict compliance with the terms of the contract as before stated. Robinson at all times when speaking of the matter asserted his wish to be out of it, and of the great inconvenience and trouble it would cause him to keep so much money out of his own business for any length of time. After the mortgage was prepared and ready to be signed similar conversations were held, and the entire subject of Mrs. Shear's embarrassment was fully and freely discussed in all of its details. I had previously acted as attorney for Mrs. Shear in procuring for her advances from merchants in Savannah, Ga., upon mortgage of the same property mortgaged to Robinson. Throughout all of the

various interviews and consultations I was consulted as freely by one as the other, sometimes in the presence of all, and at other times by Mrs. Shear alone or Robinson alone, and each seemed to speak with equal freedom and an equal understanding of their relative positions and intentions of each other. I prepared a lease of the date 1st August, 1877, at the request of both plaintiff and defendants, but was not consulted about that contract particularly. The parties had agreed to enter into that contract, and I understood from what was said that Mrs. Shear had at that date (say August, 1877,) some hope of being able to pay off the mortgage which she was about to give to Robinson when it became due, and in that event not being able as she said to carry on the plantation herself she desired to lease it for such time as she thought would enable her to get relieved from her embarrassments, or give her time to find an absolute purchaser for the property. In the meantime I understood from all parties that it had been determined that Mr. Shear should go North and engage in business there, and that Mrs. Shear was expected to reside upon the plantation free of expense, and to receive the rents.

I prepared a deed at the request of plaintiff and Mrs. Shear, and I believe the paper in the record, dated January 4, 1878, is a copy of the original prepared by me. In all the transactions in which I took part relating to said deed I acted as attorney for all the parties at their express solicitations.

I know but little of the negotiations which took place between the parties terminating in making this deed, except as I heard them from the parties themselves. I do not know how long such negotiations were pending, but some time after the execution of the mortgage heretofore mentioned (I cannot recall the date) Mrs. Shear came to my office in Tallahassee and entered upon a detailed statement

of her embarrassments, and subsequently sent for me to her place of business, then, I think, near the Post-office, in the Nims building. I had frequent interviews with her between August and November, and she discussed various plans for settling up her business, and finally informed me that it would be impossible for her to pay the Robinson debt, and that without a sale of the plantation the mortgage could not be paid. She finally informed me that Robinson had been making other advances for her besides those named in the mortgage, and that she had determined to sell him the property absolutely, for she had no hope of redeeming the mortgage, and that a certain sum in money at that time would be of greater advantage to her than the rent she might get, even if the property could be redeemed; and that she had already received money, and would receive more from Robinson; and that she saw no means of paying it without a sale of the plantation. I advised her not to sell then, but to apply to her friends at the North for assistance; and that it could only come to a sale at last under a foreclosure of the mortgage, and that before such sale could take place property might enhance in value and she might find a purchaser for a better price than the amount of her debt to Robinson. Her reply in substance was that she had no hope of aid from her Northern friends; and that she wished to settle the debts by giving up the property, so that her mind would be relieved from the anxiety attending upon the embarrassed condition of her affairs, and that she could turn her attention to some other business. The above is the substance of the numerous conversations at various times after the mortgage of August 1st was made. During the period of which I speak, after the mortgage and lease had been made, I occasionally met Robinson at Mrs. Shear's store, and he sometimes came to my office. In one of his visits to my office he told me that

28

Mrs. Shear had proposed to sell the property to him, and asked me if she had said anything to me about it. I told him that she had, and that I had advised her against doing so. Robinson remarked that he was glad of it, for he did not want to take the property, as he was then owning as many places as he could manage, and would rather have his money back in his business than to keep the property on any terms. I then told him that I could not discuss the matter with him as Mrs. Shear had not authorized me to say anything upon the subject to him. I subsequently met Mrs. Shear and Mr. Robinson together at the store of Mrs. Shear, but I do not remember at whose request. At this meeting Mrs. Shear stated her determination to sell to Robinson absolutely in consideration of the sum advanced under the mortgage and other sums since advanced, none of which she could pay. I declined giving any further advice about the details of the sale, as Mrs. Shear had not taken the last about selling, and so only took a memorandum of the amount which was stated to have been advanced by Robinson, and I was requested from that to draw the deed. I did prepare the deed, but from some cause, (I think Robinson went North,) I did not give it to the parties, and I kept the deed and brought it to Orange county with me, and enclosed it to Robinson some time in December, 1877; and I do not think I saw Mrs. Shear after that time, for I was not in Leon county when the deed was actually signed. I received a letter from Mrs. Shear dated, I think, at Cedar Key or Tampa, but she did not allude to her business matters with Robinson, or to her business in Middle Florida. The deed was intended to convey all of Mrs. Shear's remaining interest in the property absolutely to Robinson, and my instructions were to that effect.

I prepared the deed in accordance with the express directions of both Mrs. Shear and Robinson. It was certainly

so expressed, and I heard no intimation to the contrary; but the deed was not then written.

My impression is that I sent the bill for foreclosure of mortgage to Robinson with the deed in December, 1877. I think the bill and other papers were placed in the hands of Judge Bernard, of Tallahassee, who, I think, was Mr. Robinson's attorney in the case, and who obtained the decree of foreclosure. My impression is that I did not advise a foreclosure, but drew the bill at Robinson's request and sent it to him. I was not in Leon when the last deed was executed.

I think the first interview at which I was present with both Mrs. Shear and Mr. Robinson was in the store occupied by Mrs. Shear, near Gallie's store. Mrs. Shear, at that interview, did speak of debts that were pressing her, and I think there was a list of them already made out in writing. I think some property of Mrs. Shear had already been *levied* on for taxes, and it was evident must be sold if the taxes were not paid; but I do not remember the remark you quote.

I took the mortgage to the store to be executed; Robinson repeated what he had said before about the inconvenience of letting the money out of his business, and again stated emphatically that he could not give longer indulgence than that provided for in the mortgage. I know nothing about the negotiation for the lease, but understood it was intended as a protection to the property *after* the mortgage debt was paid until Mrs. Shear could make better arrangements. I mean by protection to the property that it should be occupied and kept in good order by a tenant who was able to improve it until Mrs. Shear was able to sell it. Mrs. Shear seemed to have a perfect understanding of the effect of the mortgage and lease. My impression is that they were both executed on the same day and at the same place.

There seemed to be an understanding between the parties that Mrs. Shear was to reside in the house free of charge, but there were no specific statements called to my notice as that time about it by either party; I only heard the conversation. I do not remember Robinson asking me to persuade Mrs. Shear to remove into the country at any time, but he urged her to do so several times in my presence, giving as a reason that she would live with more economy and save house rent. She said she did not approve of that part of the plan which involved her going into the country, because she was unwilling to occupy a house of which she was not the mistress, and that she had plans of her own to carry out which would require her to reside in a town.

. After the execution of the mortgage of August 1st, 1877, I had several interviews with Mrs. Shear, but I am not able to state the exact dates, or the localities of these interviews. In all matters relating to the business of Mr. and Mrs. Shear with Mr. Robinson, so far as either or all of them consulted me, I acted avowedly and by request as attorney for all.

. Mr. Robinson has never paid me any money on his account for services rendered in the affairs with Mrs. Shear, nor has he ever paid me any money on any other account for him. All that he paid on account of the affairs with Mrs. Shear was the $25 for drawing the papers, and which, as before stated, was included in the itemized amount of $225, with the credit of $25, leaving a balance of $200, for which Robinson gave his note, and which was paid to Messrs. B. C. Lewis & Sons, and by them paid to me and included in the Shear indebtedness.

. I never had any business transactions with Mr. Robinson until I acted for him and Mrs. Shear at their request in their joint business, and my opinion of his business qualifications, or unusually developed capacity for business of a

financial nature, if I formed any such opinion at all, would be that Robinson, in the then financial condition of the country in August, 1877, took a very imprudent risk for a merchant in advancing over $3,000 upon Mrs. Shear's plantation in Leon county, if he expected to recover his money out of a sale of the mortgaged premises, although I think the property may in the future be worth this amount or more, but I speak of it as a risk taken in August, 1877.

In my course of dealings with Mrs. Shear she exhibited great force and ability in dealing with questions concerning her business, but she was vacillating and disposed to yield her business interests to the frequent infirmities and necessities of her husband, and to the circumstances growing out of his business, such as the suits against Mr. Shear.

At the time of the execution of the mortgage and lease Mr. L. N. Shear was in better health than I had previously seen him in (except at intervals). Mr. Shear was very intemperate, and when he was under the influence of intoxicating liquors I do not think he had the ability to attend to any business, but when he was sober he was not only able to attend to his own business but gave evidence of good business talents and qualifications. I never attended to any business with Mr. Shear when he was unable to attend to his business properly, and never did any business at *his* request, but at the time of the execution of the mortgage and lease Mr. Shear was capable of attending to business, and was then speaking of resuming his business connections at the North, and did go North subsequently with that view.

I have not answered that Mrs. Shear at any time when I performed any service as attorney for her was incapacitated to instruct me as to what service she required me to perform.

In regard to the business between L. N. Shear and Mrs. Shear and Robinson, all important matters were done when

the parties were all present and capable, in my opinion, of doing the business, I mean to the execution of the papers about which I have been interrogated. What transpired at other times when I was not present I have no knowledge of.

I do not know about all of the negotiations between Mr. and Mrs. Shear and Robinson. Mrs. Shear exhibited and expressed great distress on account of her pecuniary embarrassments, and from her appearance and statements in the presence of others she certainly did suffer bodily pain, but I know nothing of the effect which such suffering had upon her business capacity, and always thought that the intemperate habits of Mr. Shear were her principal trouble.

I can only form an opinion from the sequel to those transactions, from which it appears that either separately or alone, or with the aid of astute counsel, Mr. and Mrs. Shear have proved so far not only a match for Robinson, but seem willing and able to look with great complacency upon the loss of his money expended in their behalf.

I have stated that Mrs. Shear did not execute the deed of 1878 in my presence, and that when I received instructions to prepare the deed Mrs. Shear was fully aware of the exact intent and purpose of the deed which she was to sign, and had expressed her inability to obtain assistance elsewhere than through Robinson.

From the statements of Mr. and Mrs. Shear, made in the presence of Mr. Robinson, the want of money alone induced them to borrow it, and to provide for its repayment in all of the conveyances, and having failed to repay the money, the deed of 1878 was given as an equivalent for the money advanced and accepted as a full and final payment for it. My belief, founded upon a knowledge of all the facts is, that Robinson had no other advantage than any other creditor of Mrs. Shear, and that his advances of money prevented a

sacrifice of her property under executions which she was unable to pay.

I do not know anything about the advances subsequent to the mortgage, except as stated by Mrs. Shear, and cannot speak accurately as to the amounts, or how advanced or paid. The deed of 1878 was given in consideration of advances over and above the sum secured by the mortgage of August 1, 1877.

My impression is that I did not advise the foreclosure suit, but I think I concurred in the opinion for the reason that there was a prior mortgage which Robinson had paid, and it was thought best to foreclose against all persons claiming by, through or under Mrs. Shear, in order to perfect the title under the absolute deed from Mrs. Shear to Robinson. My impression is that after Mr. Robinson had consulted Judge Bernard, who had been his attorney in other business, I said to Mr. Robinson that I saw no necessity for immediate foreclosure of the mortgage; that I considered the last deed of Mrs. Shear, or the deed which I was instructed to prepare, a sufficient title to the property, but that as Alexander & Maxwell, of Savannah, held a prior mortgage, but transferred to Robinson or purchased by him, I concurred with Judge Bernard that a foreclosure of the mortgage to Robinson was the safest mode of extinguishing all prior incumbrances.

I do not know of any such conversation, but state generally that the foreclosure was the subject of conversation between Mrs. Shear and myself and Mr. Robinson frequently, but I cannot give any precise dates, for it was a subject of interest to both parties, and whenever the occasion offered each would speak of it, and Robinson, always regretting having become entangled in Mrs. Shear's business, so as to compel him to take the property or lose his money, between the two I was very much annoyed, for after the determina-

tion to have a final deed made I did not care to waste my time listening to any matters of detail which could be arranged without my advice or presence, and as I did not consider myself any longer the attorney of either party in that matter I could not advise one without the presence of the other.

I have stated that I was not present when the last deed was signed, but the intention of the parties (if either of them is worthy of credit) was disclosed, when I was requested to prepare the last deed for Mrs. Shear's execution.

I cannot speak accurately as to the dates, but I came to Orange county in time to attend the spring term of the court, which I think convened on the third Monday in May, 1877. I returned to Tallahassee, I think, some time in June. I then remained in Tallahassee, with the exception of an absence of a week or ten days in Atlanta, Ga., until I returned to Orange county in time to attend the fall terms of the Circuit Courts in Volusia and Orange counties in November, 1877. I then returned to Tallahassee and remained there but a short time, and came back to Orange county in December.

I am under the impression that the deed and the bill were sent by me in a letter to Robinson from Maitland, Orange county, Florida. I may have drawn up and enclosed at the same time an answer or form of answer, but as the case had then passed out of my hands I do not know whether Mrs. Shear ever signed the answer, or ever answered at all in the case.

Robinson's testimony in almost every point bearing upon the questions in issue is contradictory of that of Mrs. Shear. They agree that he, at her request, and to relieve her financial embarrassments, advanced her at first a small sum, about $100, taking a mortgage on furniture. After-

wards he reluctantly advanced money to pay her taxes, and took up a $500 mortgage, and made engagements to pay debts amounting in all to $1,590, when the mortgage was taken to secure this amount August 1, 1877, payable one day after date. At the same time he leased the plantation and personal property for five years at the annual rent of 3,000 pounds of cotton, and entered into possession. This mortgage and lease covered all the property she possessed at the time, except her personal apparel. Soon after negotiations commenced, resulting in the paper called a deed, dated January 4, 1878. This deed and the circumstances, agreements and inducements attending it she claims was on her part intended to operate as a security for the liabilities assumed by Robinson, and indebtedness then existing, and $500 then advanced to her. Robinson, on the contrary, details circumstances and conditions going to show that the deed was the result and consummation of an absolute bargain and sale, divesting her of all right, title or interest in the property, and that the price then agreed on and paid was the full value of the property. He gives in evidence the written orders of Mrs. Shear dated January 4, 1878, on Mrs. Risley and Mr. Sims for certain property in their possession " formerly belonging to her, as I have sold all my effects to Mr. W. L. Robinson." He further insists that the mortgage foreclosure was a part of the proceedings agreed upon to consummate his title, and to cut off any latent claims that might be discovered against Mrs. Shear which might be charged upon the property. He refers also to the " agreement " dated January 10, 1878, and says it was an arrangement entirely distinct from the conveyance, and not suggested at that time but some days later, while Mrs. Shear says the original of this agreement was written and signed by Mr. Robinson immediately after the signing of the deed and the answer to the foreclosure bill, and as

a part of one transaction with these papers. In reference to the foreclosure sale Mr. R. says he would not have bid more than the amount of his investment but for the advice of his counsel; that as he had title by his deed he could bid any amount without incurring a liability to pay any more money, the property being his own and the Shears having no claim upon it or the proceeds of a sale. He regarded the foreclosure proceedings as "a mere matter of form."

As to the paper executed at Cedar Key, the testimony of Mr. Robinson, Mrs. Shear, Lutterloh and Miss Burkhim contains all the light that the record throws upon it.

The testimony of Alex. Gallie, J. Burkhim, H. R. Shine and Mary E. Risley agree to the effect that Mr. Shear was, on account of dissipation and ill-health, almost wholly incapacitated for transacting business, and that Mrs. Shear, owing to the condition of her husband and other causes, was not capable of managing business of importance, and might be easily imposed upon.

There was some testimony going to show that at the time of the execution of the deed of January 4 there was no "separate acknowledgment" by Mrs. Shear, as certified to by the Justice, and that the certificate to that effect was false. Mr. and Mrs. Shear and the Justice himself testify to this, while Mr. Robinson says the acknowledgment was made by Mrs. Shear, not in the immediate presence of her husband but in another part of the room.

[The last sentence on page 398, in the eighth paragraph of Robinson's reply, should read as follows: "Petitioner denies all that is stated between the word 'that,' in fifth line of page 393, and the word 'paper,' in fifth line of page 394, inclusive." The affidavit referred to on page 399, as marked "A," is the same in substance as Robinson's testimony on pp. 405 to 410.—REPORTER.]

*D. S. Walker, Jr., & E. M. Hopkins* for Appellant.

*George P. Raney* for Appellee.

THE CHIEF-JUSTICE delivered the opinion of the court.

I. The referee properly found upon the testimony in this case that Robinson was in the first instance reluctant to become a creditor of the appellant, and became so because of the importunity of and sympathy for her on account of her embarrassments and misfortunes.

II. We agree also that the lease and the mortgage of August 1, 1877, were not and were not intended by either party to be one instrument or contract. The mortgage is not a qualification of the lease, nor the lease of the mortgage, neither is dependent upon the other; although it is probable that the lease would not have been entered into but for the mortgage indebtedness.

III. The conclusion is inevitable also that the possession by petitioner of the real and personal property, although embraced in the mortgage, was delivered and obtained in virtue of the lease.

IV. The conveyance of January 4, 1878, was executed and acknowledged, as appears by the record, in due form of law. It was attempted by defendant to show that the acknowledgment of Mrs. Shear was not taken by the magistrate upon a private examination of the wife separate and apart from her husband, and that no private examination was had, but that the grantors signed the instrument and the Justice signed the certificate, only asking the wife, at the same table and seated by her husband where they had signed the paper, whether she knew what she was doing? She answered yes, she thought she did. The Justice then signed the certificate of acknowledgment. Mr. and Mrs. Shear testify that there was no separate or private exami-

nation. It has been repeatedly held that the certificate of acknowledgment of a deed of a married woman is conclusive, unless fraud be clearly shown by competent witnesses; and that the testimony of the parties alone was not sufficient to overcome the certificate, nor would the testimony of the magistrate be taken to contradict his official certificate. In Johnston vs. Wallace, 53 Miss., 331, the court says: "Whether the officer taking an acknowledgment acts judicially, or quasi judicially, or both judicially and ministerially, he is the person to whom our law, in the effort to protect married women from the coercion of husbands in the execution of deeds, intrusts the duty of ascertaining by her declaration made apart from her husband that she has acted freely in executing the deed acknowledged; and when a married woman has appeared before a proper officer, having signed a deed and acknowledged it, he certifies a full compliance with the statute, his certificate, except in cases of fraud, must be held conclusive of the facts which it asserts. Any other rule would open wide the door for fraud upon the grantees of married women. * * * There is far more danger that deeds of married women will be improperly sought to be set aside, if it can be done by questioning the *manner* of acknowledging them, than that wives will be imposed on in acknowledging deeds." See also Heeter vs. Glasgow, 79 Pa. St., 79; Kerr vs. Russell, 69 Ill., 666; White vs. Graves, 107 Mass., 325; Singer Mfg. Co. vs. Rook, 84 Pa. St., 442; 1 H. & McH., 211; 3 ib., 321; 2 Pick., 184.

In Heeter vs. Glasgow, the court says: "The true rule deducible from the authorities is, that the certificate of the Justice of the acknowledgment of a deed or mortgage is a judicial act, and in the absence of fraud or duress, conclusive as to the facts therein stated. A purchaser, *bona fide*, and without notice of the fraud, is protected against it; but

as to all other persons parol evidence has been admitted to show fraud or duress connected with the acknowledgment." The same question was considered by this court at the present term in Hart vs. L'Engle, *et al.*, in which it was held that a wife's acknowledgment of relinquishment of dower cannot be impeached by her testimony alone, but, though it may be impeached for fraud, the proof to sustain the charge must be of the clearest, strongest and most convincing character.

In the present case Mrs. Shear does not repudiate the execution or acknowledgment of the deed, either upon the ground of fraud, forgery or duress, and we must give to the magistrate's attestation its legal effect as it stands.

V. The next and more important question is as to the character of the deed of January 4, 1878. Mrs. Shear sought Robinson in great distress to aid her in a small way in her pecuniary affairs. Afterwards she sought more aid, and excited his sympathies in her behalf to the end that he made advances and assumed obligations for her to the extent of $1,590, for which he took her note payable immediately, and took the mortgage of August 1, 1877, for $2,000, consenting to make further advances up to the latter amount. At the same time he took a lease for five years of her plantation and all the personal property upon it, and entered into possession under this lease, Mrs. Shear remaining in the house with her family, and with no means of support beyond the small amount of rent. Mr. Robinson then made further advances, beyond the maximum of his mortgage security, the amount in November or December, 1877, being $836.91 in excess of the amount secured by the mortgage.

It is difficult to determine at this point which party was most anxious to increase the amount of petitioner's advances to Mrs. Shear. Now commenced the negotiations

which resulted in the deed of January 4 and the foreclosure proceedings.

It seems to have been concluded that Robinson should advance or pay $500 more, which, with previous advances or credits, amounted to $3,336.91, and which he says was the price agreed on for an absolute sale and deed of the entire property, real and personal. She insists that though the conveyance executed by her and her husband was in the form of a deed of conveyance, yet it was the understanding and agreement that the conveyance was made to secure him the money, and that she had the right to redeem the property at any time by paying the amount.

She says the paper in the record bearing the date of January 10 was in fact given her by Robinson the same evening the deed was executed. He says it was given some days later in response to a distinct proposition from Mrs. Shear. The paper in evidence was not the original actually signed in January, but is a substantial copy of the original, and was made by Robinson at Cedar Key in June, copied from the original which had been wet and discolored, and the original was then and there destroyed by him. In view of the entire facts of the case it is unfortunate this original paper was destroyed by him at a time when he was treating with them in the absence of counsel for important admissions, in regard to this controversy, because if it were produced it would have avoided the dispute as to the day as well as the terms of the agreement. At all events, the paper contains the essence of Mrs. Shear's construction of the deed if it was given at the time of the execution of the deed, but if it was an independent agreement it is of no binding value as a contract for the sale of land, as it is without consideration or seal, or mutuality of obligation, a mere naked proposition.

Her position here is that she claims that the deed was a security for her entire indebtedness and the five hundred

dollars then advanced to enable her to go elsewhere to seek
a livelihood, and that she was entitled in equity to redeem
by paying the amount stated, and is therefore entitled to
the surplus bid over that amount on the foreclosure sale.

If the deed of January 4, 1878, was the result of an
absolute sale of the property, it is difficult to conceive of
any plausible reason for the foreclosure of the mortgage.
If the grantors conveyed all their interest, there remained
no interest to be cut off by the foreclosure. The foreclosure
could not affect the rights of creditors or incumbrancers of
any sort, because the mortgagors only are the defendants
named in the foreclosure suit.

It is undisputed that Judge Baker, who drafted the deed
and the bill of foreclosure, understood from the parties a
month before the date of the deed that the transaction con-
templated was an absolute sale and conveyance. He sent
the draft of the deed and the bill from Orange county to
Robinson, who sent them, and they were delivered, to Mrs.
Shear to be examined before closing the transaction.

The introductory part of the deed reads: that "whereas
the said E. E. Shear and L. N. Shear are unable to comply
with the terms of said mortgage, or to pay the said sum of
money secured thereby, and they being willing and anxious
to secure said payments," therefore, in consideration of the
premises and the sum now due by the mortgage, and the
further consideration of $1,746.91 paid by Robinson, they
granted the property in fee, &c. Then the bill of foreclos-
ure, which was sworn to by Robinson on the 3d of January,
1878, the day before the execution of the deed, states the
execution of the mortgage to secure the note of $1,590, and
that he had "agreed to assume certain other indebtedness
and to make further advances, which have since been made,
amounting to the further sum of $1,746.91;" and that the
defendants have never repaid any part of *said indebtedness,*

and the whole amount is *now justly due*, and that a sale of the property is necessary *for the raising of the money*, &c.; therefore he prays a decree forever barring and foreclosing the defendants of all right, title, interest or equity of redemption, and for a decree for said amount and execution thereon, and a sale of the property; and that out of the proceeds the costs be paid, next the amount of the principal and interest of complainant's claim, "*and the balance, if any, be paid to the defendant, Eliza E. Shear, to her sole and separate use.*"

An answer was also sent to Mrs. Shear to be examined and signed, already prepared, by Robinson or his counsel, acknowledging that she *was indebted*, as charged in the bill, in the sum of $3,336.91, including the note; and defendants therefore *assent to the decree as prayed for by the bill.* This answer was signed at the same time with the deed, January 4th.

Now, with this bill informing Mrs. Shear that the whole amount of the consideration of the deed was an indebtedness, claiming that the property must be sold to pay him the amount so due him, which they are otherwise unable to pay, claiming a decree that this debt be paid out of the proceeds of a sale, and that any surplus over this amount be paid to Mrs. Shear " to her separate use," and this bill sworn to by Robinson, and an answer given her to sign and swear to, and which was sworn to by her in presence of Robinson, stating that the $3,336.91 was an indebtedness to be paid by a sale of the mortgaged property, and that she would be entitled to any surplus after paying this amount from the proceeds of the sale, how does it lay in the power of Robinson to say that she did not understand the effect of the deed to be precisely what she now claims, a security for the whole indebtedness mentioned, for a part of which Robinson, up to the date of the deed, had no se-

curity whatever?    Mrs. Shear signed that deed with these papers before her, prepared for and furnished to her by Robinson, so that she could understand what she was doing and what was the professed object and effect of such deed upon her rights in the property. If the effect of the deed was intended by Robinson to be other than that she was so made to understand ; if the sworn bill stated a lie, and she was induced and invited to sign and swear to an answer which he now claims is a lie; then he is guilty of a gross fraud upon Mrs. Shear which will avoid the deed as so much waste paper. Robinson says now in his testimony that he did not read the bill. He is estopped from this plea of ignorance by having signed and sworn to it, and by having induced the defendants to consent to a decree in accordance with the prayer of the bill.

Again, in furtherance of the prayer of the bill and the submission in the answer that such decree be made as the bill prayed for, Robinson took a decree that the property be sold, and that he be paid the indebtedness of $3,336.91 and costs, and that the surplus, if any, arising out of the sale, be paid to the defendants. And it was further provided in that decree that if the property should not sell for money enough to pay the $3,336.91 with interest and costs, there should be execution against the defendants for the deficiency.

What does this mean? It is evident that Robinson's attorneys and solicitors, who drew the deed and the bill and the answer and the decree, intended to do precisely what was done in accomplishing the purposes and establishing the rights of the parties by the most solemn and deliberate forms and methods.

The only conclusion to be drawn from all the reliable facts in the case is that the deed of January 4, 1878, was in its legitimate effect and purpose, and in its execution was

29

intended to be, a security for the sum of $3,336.91, owing by the grantor to the grantee, and that as between these parties it must be given such effect. Such, indeed, is the result of the adjudication by which the decree of foreclosure was intended by consent or agreement of these parties, and establishing their several rights. In Glover vs. Payne, 19 Wend., 518, the court says: "Had it appeared that the deed was given to secure a pre-existing debt or a loan of money, or that the consideration paid for the land was greatly below its real value, a question would arise whether it was not a mortgage." (In that case the grantor had, after the execution of a deed, taken a lease from the grantee.)

The circumstance that there was no personal security taken for the payment of the money does not make the conveyance less effectual as a mortgage. (Russell vs. Southard, 12 How., 139, 152, and citations.) Brown vs. Dewey, 1 Sandf. Ch., 56, reviews the cases and shows that the absence of personal liability of the grantor to pay is not conclusive to determine whether the conveyance is a mortgage.

Speaking of a conveyance by the mortgagor to the mortgagee of his equity of redemption, the court in Russell vs. Southard says: "We think that inasmuch as the mortgagee in possession may exercise an undue influence over the mortgagor, especially if the latter be in needy circumstances, the purchase by the former of the equity of redemption is to be carefully scrutinized when fraud is charged, and that only constructive fraud or an unconscientious advantage which ought not to be retained, need be shown to avoid such a purchase. * * * A mortgagee in possession may take a release of the equity of redemption. But such a transaction is to be scrutinized to see whether any advantage has been taken of the mort-

gagor; especially is this necessary when the mortgagee in the inception and throughout the whole conduct of the business has shown himself ready and skilful to take advantage of the necessities of the borrower." The court cites 2 Schoales & LeFroy, 673, in which Lord Redesdale declares that courts view transactions of that sort between mortgagor and mortgagee with considerable jealousy, and will set aside a conveyance of the equity of redemption where, by the influence of his incumbrance, the mortgagee has purchased for less than others would have given.

VI. It is insisted that the petitioner should be relieved of his bid because he was laboring under a misapprehension of the facts of the case. An examination of the record fails to show that he was ignorant of any material fact bearing upon the rights of the parties. The most that can be said is that he did not apprehend the legal and equitable effect of his decree, and that in bidding above the amount of the decree he did not know that he would be, and was advised by counsel that he would not be, required to pay the excess. This is purely a question of law, arising out of facts of which he was fully cognizant.

The presumption is that every person is acquainted with his own rights, provided he has a reasonable opportunity and capacity to know them.

Fonblanque has laid down the general proposition that in courts of equity mere ignorance of the law shall not affect agreements, nor excuse from the legal consequences of particular acts; and in this he is fully borne out by authorities. (1 Story's Eq. Jur., § 111, 139.)

It would be superfluous to enter upon a discussion here of this question. Judge Story and the Supreme Court of the United States have so fully examined it and pronounced the rule in view of all the authorities, the question is no longer open.

VII. After the sale under the decree the petitioner went to Cedar Key and sought out the mortgagors. He first found a Justice of the Peace and informed him that he should require his services in certifying some papers which the Shears would execute when Mrs. Shear should return. The time was fixed at nine o'clock P. M. Robinson said he had the papers all ready, but had not then seen Mrs. Shear. At ten o'clock Robinson sent for Lutterloh, the Justice, and he went to Mrs. Shear's door, and Robinson met him and said he was not ready, and he wanted to have " some further conversation with these people." At half-past eleven Lutterloh was again sent for, and met the parties, and Robinson commenced reading the paper, explaining as he read, and convinced Lutterloh as well as the Shears that they had no rights in the matter whatever that could be enforced in law or equity, and that their honor and reputation required that they should sign the paper. What Robinson had previously said to Mr. and Mrs. Shear Lutterloh does not know. Delia Burkhim testifies that Robinson said all he wanted was the money they owed him. This was when R. copied and signed the paper called the agreement to sell.

Robinson paid the Shears on that occasion one hundred dollars, and took from them a receipt commencing " whereas, in the purchase of W. L. Robinson from us of the land and property described in the deed of January 4, 1878, by agreement the said Robinson did retain for his protection in case he had to pay a certain claim of Dr. John S. Bond; and, whereas, being in need of funds, we have applied to said Robinson to pay us $100, and he has paid the same to us this day," &c.; and the paper further stipulates that they will refund the money to Robinson in case he shall pay the money to Dr. Bond.

Mr. and Mrs. Shear state in detail the reasons why they

signed the paper at Cedar Key consenting to the execution of a deed and relieving R. from paying his bill, &c. Their statement is more full in regard to his representations to them of what had transpired at the sale than Robinson gives in his testimony. They say that Robinson told them that Hopkins and Walker and Williams were engaged in a black-mailing operation to defraud him; that Williams' bid was the mere act of an enemy to annoy him; that Judge White had decided they had no rights, and counsel had given opinions to the same effect, and they gave their assent to the paper to save Robinson from being ·cheated and defrauded, as they were led to believe, and to save their own honor and reputation, which R. said was being injured by the conduct of Hopkins, Walker and Williams. They further say that parts of said paper were not read to them by Robinson, who pretended to read it to them. The Shears had no counsel or advisers, were very poor and in desperate circumstances, to whom $100 was a great relief, and it appears by the testimony of several witnesses that they were mentally incapable of managing important business affairs.

It would be doing violence to equity and good conscience to hold them to the provisions of that paper under the circumstance in which they were induced to sign it; their ignorance of the facts, their weakness, the impressions made upon them during the several hours Robinson spent with them in the night in the absence of counsel or friends, and the legal and equitable rights intended to be affected by it. If the Shears had an interest in the surplus money it would certainly be inequitable that Robinson should deprive them of it by any means whatever without their intelligent concurrence. 1 Story's Eq. Jur., Sec. 128; 1 Peters, 15, 16.

VIII. Another reason given by the petitioner why he should be relieved of his bid is that the property is not

worth it, and not worth more than the amount named in the deed ; that Williams run up the price in bad faith and for the purpose of annoying aim.  It does not appear by the testimony of the several respectable witnesses that the land and improvements were worth less than the amount bid.  Some estimate them at a higher and others at a less amount.  The fact remains that Robinson refused to accept a bid of $7,900 and bid higher himself.  Judge Bernard and Mr. Perkins heard Williams say that he would not have bid it up if Robinson had paid him one or two hundred dollars.  Williams says, however, he was bidding for the purpose of buying, and was ready and willing to buy and pay for the property.  Other witnesses state facts showing Williams' intention and ability to become a purchaser at the amount of his bid.  What Williams may have said in jest or in earnest afterward does not affect the fact that he was a responsible bidder.  Nor do we see why such a bidder should " annoy " Robinson, while he was at all times professing to be unable to spare from his business the money he had invested and assumed to pay for the Shears.  It would be very natural to conclude that Robinson, instead of being annoyed, would be rejoiced at the opportunity of doubling his investment in a few months, and if not for his own sole benefit, at least to the advantage of the unfortunate people in whose behalf his sympathies had been so actively aroused.  He persists that the property is not worth more than he has invested, but a better test of his estimate of its value is his refusal of $7,900 for it.

These conclusions are the result of a careful and patient examination of the voluminous record laid before us and of the authorities at hand.  The decree setting aside the sale must be reversed and the cause remanded, with directions that further proceedings be had therein in accordance with this opinion and the practice of the court.

Leave having been obtained at the January Term, 1881, at which the foregoing opinion was rendered, the appellee filed, within thirty days after the adjournment, the following petition for a rehearing:

The appellee respectfully asks for a rehearing in this cause, and in support thereof submits the following:

I. It is held by the court that "the only conclusion to be drawn from all the reliable facts in the case is that the deed of January 4, 1878, was in its legitimate effect and purpose, and in its execution was intended to be, a security for the sum of $3,336.91-100 owing by the grantor to the grantee, and that as between these parties it must be given this effect." In this the petitioner respectfully submits there is error. Judge Baker who drew the deed says that he was employed to act for both parties in drawing an absolute conveyance; he had full consultation with them, together and separately, and each understood that an absolute sale of the property was to be made, and he prepared the paper for this purpose, and as an absolute conveyance. In the opinion of your Honors, prepared by the Chief-Justice, it is expressly stated that "it is undisputed that Judge Baker who drafted the deed understood from the parties a month before the date of the deed that the transaction contemplated was an absolute sale and conveyance. He sent the draft of the deed and the bill from Orange county to Robinson, who sent them and they were delivered to Mrs. Shear to be examined before closing the transaction." There is no doubt, unless Judge Baker is not to be believed, and certainly I am justified by the above quotation in saying the court believes him, that both parties up to their last interview with him, or his last interview with either of them, intended an absolute conveyance, yet notwithstanding Judge Baker's testimony as to interviews with them together and separately, and the understanding

and instructions communicated to him, Mrs. Shear says it was on the 4th of January, 1878, at Glenwood, at the signing of the papers, that Robinson *first informed her that* the paper he wished her to sign was a bill of sale, and not an agreement to foreclose the mortgage. I understand Mrs. Shear as meaning by the statement that she had never heard from Robinson, or had with him any agreement to execute an absolute conveyance. If Mrs. Shear is to be believed then Judge Baker is not to be relied on; but it is too clear that Judge Baker is to be believed and Mrs. Shear not to be, as to the arrangments agreed on. It is clear also that the papers executed, including the foreclosure proceedings, were prepared and sent by Baker as the agencies for perfecting the title in Robinson. Robinson understands them so; when he goes to Glenwood to have them executed he expresses the same understanding which he had always had. To hold that the deed was in its execution intended to be a security for the purposes stated is to rely upon a part of Mrs. Shear's testimony, who has certainly not spoken the truth as to another stage of the negotiations, if Baker is to be given the credence accorded to him and merited by him. The petitioner respectfully submits that even if any credence is to be given to Mrs. Shear's statements as to the negotiations at Glenwood on the day mentioned, the effect of her testimony is not that the transaction was a security for merely the $3,336.91-100, or this sum and interest, for the agreement she claims to have been given to her by petitioner on that day, as set out by her, (pages 400, 401,) is an agreement of petitioner to sell to her for $3,336, "with interest and full value for any improvements, with interest at 16 per cent." Mrs. Shear is either to be believed or not to be believed. If the former, then her understanding and agreement was not that she could get back the property by paying the

$3,336 or $3,336.91 and interest, but by paying him one of these amounts and interest and the full value of improvements and interest. The interest to be at the rate of 16 per cent. There can be no doubt that Robinson understood that he was to get the absolute title, unless Mrs. Shear is to be believed, and if she is to be believed then he was to have the legal title, subject, however, to an agreement to sell to her, not for the debt and interest but for these and an additional consideration, the full value of all improvements. She could not, according to her own testimony, claim the property upon paying the $3,336.91 and interest; nor should be allowed to claim the proceeds of the property over and above the same amount. Although the bill and answer were drawn as they were, yet in point of fact, taking Mrs. Shear's testimony and believing it as a whole, (and it is to be believed as such or not at all) and assuming she had carefully read all the papers, Robinson was then expecting and claiming an absolute conveyance, and believing the papers Baker had drawn would secure it to him. Whether Baker or Bernard originally suggested the foreclosure, he " concurred in the opinion for the reason that there was a prior mortgage which Robinson had paid, and it was thought best to foreclose against all persons claiming by, through or under Mrs. Shear in order to perfect the title under the absolute deed from Mrs. Shear to Robinson," and after Robinson consulted Judge Bernard, who had been his attorney in other business, he (Baker) said to Robinson that he saw no necessity for immediate foreclosure of the mortgage; that he considered the deed he was instructed to prepare a sufficient title to the property, but that as Alexander & Maxwell held a prior mortgage, but transferred to Robinson or purchased by him, he (B.) concurred with Judge Bernard that a foreclosure of the mortgage to Robinson was the safest mode of extinguishing

all prior incumbrances." The purpose of Mr. Baker in advising it, however mistaken it may have been and however crudely carried out, was not that it was necessary as between the grantee and the grantor, but as to third. parties; that as to these the mortgage should be kept alive. It is competent for one to purchase of his mortgagor the legal title and still keep his mortgage alive and foreclose it against other lien holders. The courts, in the absence of evidence of express intention to keep it alive or not, will look to the interest of the purchaser, and assume that he so intended if it appears to be to his interest to do so. With proper deference it is with confidence asserted that the testimony carefully considered shows that neither Mrs. Shear nor Robinson understood or intended, at the execution of the papers on the 4th of January, that the deed was or should be a security as stated and found by your Honors, but to say the most for Mrs. Shear it was at least intended as a conveyance to Robinson of the legal title, a satisfaction of her debt to him, and that the other paper should give Mrs. Shear the right to repurchase on the terms therein stated. In view of all the testimony it cannot be believed that Robinson would have permitted the commencement of the foreclosure proceedings if he had understood they would have the effect sought to be given them; nor that Mrs. Shear when she signed the papers believed they would have such effect. The fact that the Shears never made or attempted to make any arrangements for having some one look after her interests at the sale when she left Tallahassee, goes of itself to show that she did not regard herself as having any interest in the property, unless through a right to purchase it back under the terms stated in the additional paper referred to.

Why, if Robinson or Baker intended or understood the deed of January 4 as a security, was not it foreclosed in-

stead of the old mortgage? The foreclosure proceeding is, we respectfully submit, accounted for by Baker. It is a thing Robinson would never have suggested himself as a means of getting title. It is a proceeding, however crude, which on its face shows that a lawyer advised it and not a layman.

II. With proper respect petitioner believes and urges that it is error in the court to hold that he in bidding acted under mere mistake of law. (Story's Equity Jurisprudence, §141.) He believed as a matter of fact that the ownership of the property as against the Shears was in him. He had negotiated to this end, and believed it to be consummated. Robinson cannot be said to have acted solely on Mr. Bernard's advice as to bidding. He was also acting on the belief that in bidding he was carrying out the purpose of both parties, a belief made strong by the dealings between him and the Shears, and by the opinion and advice of the chosen counsel of both parties.

Moreover, it is not always the case that equity will refuse to grant relief against a mistake of law. If it be a mistake of law it cannot be said to arise from a mere misapprehension of the effect of the decree, for he was not relying solely on the foreclosure proceedings; in fact the foreclosure proceedings in the light of Baker's advice were not instituted for the purpose of having any effect as between him and the Shears. 8 Wheaton, 211-16; Kerr on Fraud and Mistake; Story Eq. Jurisprudence.

III. In regard to the transactions at Cedar Key, Robinson and the Shears differ in their statements as to some features, but looking to the testimony of Lutterloh, who was with them for two hours, and to its statements of facts as contradistinguished from mere opinions, we find that Robinson there claimed that he had form-

erly bought the land, and that the Shears did not deny it. Miss Burkhim's testimony that Robinson said all he wanted was the money they owed him, taken in connection with the paper before him, can bear no other reasonable interpretation than that he meant that the money which would be payable to him under that paper would satisfy him and secure a return of the property. Robinson denies the statements as to Hopkins and Walker imputed to him by the Shears. He does state that they were interfering and trying to make him pay that which he had never expected to pay, and it is clearly shown by the testimony that the knowledge of Hopkins' interference was the cause of Robinson going to Cedar Key. Robinson further says that Williams had run the property up on him, and Robinson's testimony shows that when he was bidding he believed that Williams was not bidding in good faith but to annoy him. As to the Shears signing the paper to save Robinson from being cheated and defrauded, " as they were led to believe, and to save their own honor and reputation," it is clearly shown that they did not deny that Robinson had previously purchased the property from them, and that they understood that Robinson was to be released from the payment of the balance of the bid over and above the purchase price named in the decree, which was to be credited on the decree. Whether the paper dated January 10, 1878, was executed on the 4th or 10th, Robinson believed it to be binding upon him, and he believed, and so did they, that he had become the purchaser in January from them, and the great purpose of the paper executed at Cedar Key was to secure a release from the bid which he had made on property he naturally believed, and they admitted, to be his. As to not reading all the paper to them, this Robinson denies.

As to the Shears having " had no counsel or advisers,"

and being " very poor and in desperate circumstances to whom $100 was a great relief," the interference of one of their counsel before this court was the cause of Robinson going to Cedar Key. His letter had advised them that they could claim the money over and above the amount of the decree. Right here it is to be observed that there is no denial on the part of the Shears of their having written Mr. Hopkins the letter which plainly tells him they can attend to their own business and he to his. There is no denial of Robinson's statements as to what passed or occurred as to Mr. Hopkins. They had been advised of Mr. Hopkins' views of their legal right to the excess of the bid. In view of the letter of Mr. Hopkins can it be said they were without counsel or advisers? The $100 was, as the Shears says, not paid in consideration of the execution of the instrument signed by the Shears. It was not mentioned till after the execution of the paper by the Shears. The renewal of the paper of January 10 at Cedar Key was requested by the Shears, on account of its stained condition. There is nothing to show that Robinson had sought or suggested such a thing. The destruction of the old paper is what any sensible man would have done. Certainly it would not have been business-like or reasonable to leave both outstanding. The only substantial difference, Mrs. Shear alleges, between the renewal and the original is two per cent. interest. This change Robinson denies, as he does all others. There is no witness to the contrary but Mrs. Shear.

Robinson's conduct in going to a Justice of the Peace on his getting to Cedar Key is alluded to by the court. In transacting the business there he had either to do it secretly or openly. Had he introduced no witnesses to such transactions the secrecy native to fraud would have been imputable to him. Had he, when the witnesses were present,

had no conversation or explanation with the Shears before them, but only a reading of the papers, or had he enjoined any secrecy on them, there would have been circumstances usually indicating fraud. There is no testimony by the witnesses to a single substantive act of fraud, or circumstance ordinarily showing fraud, upon the part of Robinson. Mrs. Shear has pronounced everything a fraud, it is true, from beginning to the end, but it is confidently submitted that she is not to be believed. Nothing is plainer than that she applied to Baker, and separately and with Robinson instructed and advised Baker that an absolute sale was intended, yet she swears that Robinson never said anything to her about an absolute conveyance until January 4, 1878. " *Falsus in uno, falsus in omnibus.*" Robinson's acts at Cedar Key show no intention to obviate the agreement to permit Mrs. Shear to purchase. Had such been his intention, he would have desired and attempted to take up instead of renewing the agreement of January 10th. We respectfully submit that the conclusion of the court as to the transactions here are not borne out by the testimony.

IV. We respectfully submit that the court has erred as to the value of the land and property as shown by the testimony. The great weight of the testimony is with Robinson in asserting the property is not worth the bid. Pearce and Houstoun do not get square down to the question as to what this land is worth. Pearce says the committee agreed not to put a fixed value on it, and what he would take for his own land. Houstoun's idea is that land which brings so much is worth so much. The fact that Robinson refused to accept the Williams bid of $7,900 is taken hold of by the court as a strong circumstance of his valuation of the property. The testimony shows that Robinson regarded his agreement of January 10th as one to be kept; that he was regarding it in his bidding, and that it was his duty

under it to bid. in the property and secure the Shears the privilege of availing themselves of that agreement. He had never shown any disposition to evade or break it. They say that under it they were to have the privilege for at least five years of repurchasing. He had made great improvements on the place, and the agreement provided for his being repaid for them as well as the Shears getting these improvements at their cost and interest in case they repurchased. Even admitting this agreement was not executed till January 10th, and was not binding on him, still he believed it was, the Shears believed it, and he acted on it, and in bidding he was doing so as much for the Shears as for himself. In asking for the sale to be set aside Robinson is seeking nothing that the Shears did not contemplate when they took the agreement. If not set aside, is he to lose all the benefit of his improvements? Is it natural to suppose that Robinson would have made any improvements if he had understood that he was merely securing the $3,336.91-100 when the papers of January 4th and 10th were executed? Robinson has not broken faith with the Shears. He has stood ready to carry out the agreement of January 10th, and merely desires that the Shears will stand to it and not break faith with him. For the Shears to insist upon anything else is, we respectfully submit, fraud in them, and Robinson is but seeking to carry out the agreement which they say was made in good faith.

In consideration of the premises, your petitioner prays that he may be fully reheard upon the points above stated, and to that end and that full justice may prevail your Honors will grant a rehearing, and, as in duty bound, your petitioner will ever pray.

Geo. P. Raney,
Solicitor for Petitioner.

At the June Term, A. D. 1881, the following opinion denying a rehearing was delivered by the CHIEF-JUSTICE:

The appellee petitions for a rehearing upon several grounds.

1. It is insisted that our conclusion " that the deed of January 4, 1878, was, in its legitimate effect and purpose, and in its execution was intended to be, a security for the sum of $3,336.91, owing by the grantor to the grantee, and that as between these parties it must be given this effect," was erroneous and not supported by the law and the facts.

It cannot be expected that we shall recapitulate all the salient points of the testimony in deciding upon this petition. In the opinion already given we announced the conclusions arrived at upon a view of all the facts upon the equitable rights of these parties.

Upon a patient review of all the testimony we have failed to reach any different conclusion. The testimony of Bolling Baker leads to the conclusion that, according to his understanding of the parties, the Shears were to give Robinson a deed conveying to him a title in fee simple. Robinson says that was the intention of the parties. Mrs. Shear insists from first to last that the purpose of the deed was, whatever the form of the conveyance, to relieve herself from the embarrassment of her situation, to provide that her other creditors should be paid, that Robinson should be paid, and that whenever the property should be sold she might have the benefit of any advantageous sale. Baker's last interview with the parties resulted in his drawing up and forwarding to Mr. Robinson the deed and the bill of foreclosure. These papers, after Robinson had made oath to the bill, were sent to Mrs. Shear to read, and these papers are, as they bear upon each other, when signed, the highest evidence of the agreement of the parties. The peculiar language reciting the consideration of the deed of convey-

ance (as before quoted) may well have given Mrs. Shear the idea that it was carrying out an intention to "secure" the payment of money which she could not then pay. Its language is, "being willing and anxious to secure said payments," referring to the mortgage indebtedness of $1,590, "and in consideration of the premises and the sum now due by said mortgage, and the further consideration of $1,746.91 paid," &c., the grantors convey the property, real and personal, in fee. Then, as we before remarked, the bill of foreclosure which he had sworn to alleged that the sums of $1,590 and $1,746.91 were a subsisting indebtedness; that it had never been paid, "and that the whole amount is now justly due," &c.; and then asks the court to decree a sale for the purpose of satisfying such indebtedness; and that after paying the money so due to Robinson the residue of the proceeds be paid to Mrs. Shear "to her sole and separate use." Then the answer furnished by Robinson was before her, admitting all the allegations in the bill and joining in the prayer for such decree, which she was, in view of her understanding of the transaction, willing to swear to, and did swear to in his presence before a Justice of the Peace brought there by him for the purpose.

What avails it that there had been an agreement to sell the entire property for the amount due him? Here is the entire agreement between the parties reduced to writing and sworn to by both parties. What was in her mind on reading and signing these papers except that they expressed her intention, and his at the moment of the consummation, and without forgetting what she says was the first intimation as to a "bill of sale" in the early part of the interview, the true character of the contract as closed by the signatures and oaths of both parties, agrees with her testimony in the case.

30

466 SUPREME COURT.

Judge Baker was not present at this execution of the papers. He understood, according to his testimony, that Mrs. Shear was to sell the property to Robinson. If that was his understanding at the time of preparing the bill and answer, we fail to comprehend him. If, at the time of the execution of the deed by Mrs. Shear and the making oath to the bill and obtaining her answer agreeing to the decree prayed for, he supposed the transaction was merely a conveyance to him in fee, we fail to comprehend him. The facts stated in the bill are true or false. Mrs. Shear says they are true. The bill, answer and decree corroborate her in this respect. If neither of them is to be believed, the case, in the respect of the character of that deed, stands upon the writings executed with it as a part of the transaction and declaring its purpose as unmistakably as though they were written on the same piece of paper.

The paper signed by Robinson only agreeing to sell the property to Mrs. Shear, and which seemed to satisfy her at the time, if not a part of the transaction is of no moment for reasons before stated. The foreclosure of the mortgage may have been intended as one of the agencies for " perfecting the title," but if the title was conveyed by the deed we fail to discover the object of foreclosing and obtaining by the oaths of the parties a decree *judicially establishing* the fact that the expressed consideration of the deed was still a subsisting indebtedness. This cannot be a matter of fraud, accident or mistake.

The suggestion that Mrs. Shear, when she left Tallahassee, made no arragements to have her interests looked after at the sale goes to show that she did not regard herself as having any interest in the property. Her situation at Cedar Key is shown by the testimony, as is also her capacity for transacting this kind of business. Whether she knew of the time and place of the sale we do not know, but it seems some one informed her afterwards.

II. The second ground of the petitioner is that it was error to hold that in bidding he acted under a mere mistake of law, while in reality he believed the ownership of the property was in himsef; that he did not act solely on the advice of his counsel as to bidding; he was also acting on the belief that in bidding he was carrying out the purpose of both parties, a belief made strong by the dealings between himself and the Shears, and by the opinion and advice of the counsel of both parties.

All which means that he was bidding under an impression that the Shears had no interest, while his decree informed him that he was enforcing a subsisting indebtedness, and that his deed was a security for the money. We do not see that he was ignorant or misinformed of any fact whatever upon which his whole conduct or action was based.

It was stated in the opinion that as a general rule equity would not relieve from the legal consequences of acts under a mistake or ignorance of law. True we did not state that there are exceptions to this rule in so many words, but said in the language of the books that the presumption is that every person is acquainted with his own rights, provided he has a reasonable opportunity to know them. (1 Story's Eq. Jur., §111.)

In Cullen vs. Ready, 2 Atk., 591, Lord Hardewick says: "It is said they might know the fact, and yet not know the consequence in law, but if parties are entering into an agreement and the very will out of which the forfeiture arose is lying before *them and their counsel* while the drafts are preparing, the parties shall be supposed to be acquainted with consequence of law to this point, and shall not be relieved under a pretence of being surprised, with such strong circumstances attending it."

Chancellor Kent, in Storrs vs. Baker, 6 Johns. Ch., 169,

says: " It is rarely that a mistake in point of law, with a full knowledge of all the facts, can afford ground of relief, or be considered as a sufficient indemnity against the injurious consequences of deception practiced upon mankind. * It would seem therefore to be a wise principle of policy that ignorance of the law, with knowledge of the facts, cannot generally be set up as a defence."

There is a class of cases cite 1 in Story's Eq. Jur. and in Kerr on Fraud and Mistake, p. 399, *et seq.*, where persons have entered into agreements and there was a mutual misapprehension or ignorance of legal rights; or where one party had imposed upon another by misrepresenting or concealing the existence of legal rights; or where a person supposing himself liable, through ignorance of law, had assumed a liability; or where one gave up a good security for another which was void; or where a sister, being ignorant of her rights under a settlement, released her rights to a brother; or where a daughter accepted a legacy and released her orphanage which was much more valuable; and like cases, the result of imbecility or gross improvidence or imposition, each case depending upon its peculiar circumstances, equity has given relief.

" Upon a close survey," says Story, (1 Eq. Jur., §120,) " many, although not all of the cases, [where the party, knowing all the facts, has acted upon a mistake of the law,] will be found to have turned, not upon the consideration of a mere mistake of law, stripped of all other circumstances, but upon an admixture of other ingredients, going to establish misrepresentation, imposition, undue confidence, undue influence, mental imbecility, or that sort of surprise which equity uniformly regards as a just foundation for relief." And where an instrument was acknowledged to have been entirely misunderstood by both parties to it, equity may afford relief. 8 Wheaton, 216.

We find no rule announced by the courts which gives ground for relieving the petitioner from the burden assumed by him, under the circumstances of this case, upon the ground of mistake.

As to the transaction at Cedar Key we think, upon a review of the testimony, that the conclusion of the court were correct. The signing of the paper there by the Shears was, considering their condition and all the circumstances preceding it, not such an act of deliberation and freedom from the influence of their peculiar condition as to commend it to the conscience of the court as one determining any material, legal or equitable rights. Several hours of the night were spent by Robinson with them before they were induced or persuaded to assent to the signing of a paper prepared in advance for them by his counsel, and not as the result of a conference in which they should have had the aid of prudent counsel. Nor was any one present with them, but after the long private conference in which they agreed to sign the paper the magistrate and witnesses were admitted and the paper then signed and attested as stated in the former opinion. And we perceive no reason for refusing to believe the testimony of Mr. and Mrs. Shear and for giving credence alone to that of Robinson as to what transpired between them alone.

IV. The fourth point made is in regard to the value of the land and other property. As to the value of the land, while some of the witnesses did not fix any definite money value, yet their comparison of it with other lands in the vicinity and their value give a fair means of estimating it. Taking in this connection the house, outbuildings, farming tools, wagons, carriages and appurtenances, pictures, books, ornaments and furniture, Mr. Robinson's estimate of the value at the time of the sale, refusing to let it go at $7,900, is a better criterion by which to judge of it.

That his object was to give the Shears the privilege of purchasing it from him on the terms mentioned in the memorandum he had given to Mrs. Shear, and for this reason he refused to sell to Williams, (who was a responsible bidder even if he did desire to " annoy " Robinson by endeavoring to purchase) is not substantial or plausible.

If his desire was that Mrs. Shear should have the benefit of the market value of the property, over and above the amount due and interest and value of his improvements, there and then was the opportunity to befriend them by selling for a good price property which he now says he did not consider worth the amount of that bid. His expressed desire was to be reimbursed, and that Mrs. Shear might be benefited by the opportunity to purchase, or to find a purchaser on the terms named in the memorandum. The opportunity presented itself, and he declined to give them the benefit which he admits they were equitably entitled to.

While the case was pending on petition for rehearing there was a motion for the appointment of a receiver of the property, but it was denied.

The following decree was entered : (2 Daw. Ch. Pl. & Pr., Cooper's Ed., 1,282 ; Harding vs. Harding, 4 Mylne & Craig, 514 ; Saunders vs. Gray, ib. ; Tanner vs. Radford, ib., 515, 524.) The appellee having by leave of the court filed his petition for a rehearing of this cause, and the court having duly considered the same, it is ordered that the said petition be denied. And thereupon it is ordered, adjudged and decreed that the order and decree made by the referee in this cause setting aside the sale of the mortgaged premises, be and the same is reversed and set aside, and that this cause be remanded to the Circuit Court for the county of Leon, with directions that a decree be entered in said cause that the said William L. Robinson, within

thirty days after the entry of said decree, be required to pay to the master, W. K. Beard, or to such other master as may be appointed, the balance of the purchase-money bid by him at the sale of said property, after deducting the amount due to him under the original decree, which amount shall be ascertained by said master, and interest at the rate of eight per cent. per annum upon said balance from the date of said sale. Whereupon the said sale will stand confirmed, and said master is directed upon such payment to make deeds to said Robinson of all of said real and personal property, but that should said Robinson fail to pay said master said sums of money in the time above specified, said master shall sell all said real and personal property in the manner directed by the said original decree for cash, to be paid on the day of sale, and that the said sale shall be at the risk of the said Robinson, and if the highest bidder at said sale shall fail then and there immediately to pay the purchase-money the master may reject said bid and sell said property again, or postpone the sale to some other day, and that said master is directed to deliver to the purchaser when he shall have complied with his purchase all of said property. And that said master, with the proceeds of said resale pay first the costs incurred since the filing of said petition to set aside the sale, including the costs adjudged against said Robinson in the Supreme Court, and the remainder towards the payment and satisfaction of said amount which shall be found by said master to be due Eliza E. Shear by the effect of said original decree, and interest as aforesaid, by deducting from the amount of Robinson's bid of $8,000 the amount due to him at the time of said sale, and if there should not be enough for that purpose, that execution be issued against the said Robinson for any balance that may remain after applying said proceeds, to be levied as other executions at law, and that

should there be a surplus over and above the said sum which shall be found due said Eliza E. Shear and said costs, together with interest, the master shall hold said balance subject to the order of the Circuit Court. And that said master, when he shall have fully obeyed this order, forthwith report his doings thereon to the Circuit Court for confirmation, and that such further proceedings be had thereon as are consonant with the rules of pleading and practice in chancery in that court and this decree. And it is further ordered by this court that said William L. Robinson be and he is hereby ordered and enjoined that the said personal property be not sold, or in any manner removed or disposed of by him, his servants or agents, until he shall have complied with the terms of the sale made to him by the master by paying the amount found to be due to Mrs. Eliza E. Shear as aforesaid to said master, or until the further order of the Circuit Court.